**Warren BACON et al., Plaintiffs,**

v.

**Sidney T. HOLZMAN et al., Defendants.**

**No. 67 C 177.**

United States District Court
N. D. Illinois, E. D.
Feb. 17, 1967.

Harry Golter, David Long, Chicago, Ill., for plaintiffs.

William R. Ming, Jr., Stanley Kusper, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

This is a class action brought to restrain the enforcement, operation and execution of the Illinois statutes relating to the election of aldermanic candidates for the City of Chicago.

The plaintiffs are in two classes. One class consists of candidates who were denied places on the ballot for the ensuing February 28, 1967 election by the defendants, members of the Chicago Board of Election Commissioners. Assertedly, they all have submitted timely nomination petitions and other forms and affidavits requisite to being placed on the ballot as candidates for alderman in the aforesaid election. The other class consists of certain allegedly qualified voters in Chicago who have signed nominating petitions for certain aldermanic candidates in their respective wards, and who would vote for said candidates, had the latter not been ruled off the ballot by the defendants herein.

Charging that they have been denied the protections of the due process and equal protection clauses of the Fourteenth Amendment, plaintiffs challenge the allegedly arbitrary, capricious, and discriminatory manner in which the names of the aforesaid candidates were stricken from the ballot. Under the Fourteenth Amendment, Title 28 U.S.C. § 1343, Title 42 U.S.C. § 1983, and Title 28 U.S.C. §§ 2201 and 2202, they seek a preliminary injunction enjoining defendants from printing ballots lacking the names of the plaintiff candidates and certain other candidates, from distributing absentee ballots without said names, and from carrying out the election on February 28, 1967, pending a determination of the questions raised herein. They also seek a mandatory injunction to place the names of the plaintiff candidates, and certain other candidates on the aldermanic ballot. In

Count II, under 28 U.S.C. § 1343, and 42 U.S.C. §§ 1983 and 1985(3) each plaintiff further seeks a judgment of $100,000 against the defendants for the actions heretofore charged.

In a memorandum opinion rendered on February 7, 1967, this Court denied plaintiffs' request to convene a statutory three-judge court pursuant to 28 U.S.C. §§ 2281 and 2284, to hear these proceedings. The Seventh Circuit sustained that ruling on February 15, 1967, by denying plaintiffs' motion for a writ of mandamus. Our decision on that motion determined that by their petition, plaintiffs raised no substantial challenge to the constitutionality of the disputed Election Code provisions, Ill.Rev.Stat. c. 46, Secs. 10–4, 10–10. However, we reserved plaintiffs' right to pursue their allegations based upon the alleged arbitrary, capricious, and discriminatory enforcement of the said statutes.

Hence, the major substantive issue framed by the pleadings is this: Did the defendants deny the plaintiff candidates a place on the ballot for the forthcoming aldermanic election by means of a hearing procedure so arbitrary, capricious, and discriminatory as to be lacking in the requisite protections assured by the due process clause of the Fourteenth Amendment.

Although plaintiffs allege that defendants' actions violated the equal protection clause of the Fourteenth Amendment, they adduced no evidence during the course of the three day hearing before this Court to warrant further consideration of that issue here.

The landmark case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), held that it was no longer necessary in prosecuting an action under Sec. 1983, to allege a specific intent to deprive a person of a federal right.[1] But even so, we have seen no evidence, nor have plaintiffs argued persuasively that the equal protection clause has any ap-

plication here. In his closing statement, plaintiffs' counsel dealt almost exclusively with the due process arguments. Accordingly, the remainder of this decision will deal exclusively with the due process arguments.

Initially we must consider whether this Court is a proper forum for this action.

Section 1983 of Title 42, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ In order to sustain the burden of establishing a proper jurisdictional foundation under Section 1983, or Section 1343, plaintiffs must show that the deprivation of the right to become a candidate for alderman in the city of Chicago is a right or privilege secured by the constitution and laws of the United States.

■ However, it has been held that the right to become a candidate for state office is a right or privilege of state citizenship, and not a federally guaranteed right. Snowden v. Hughes, 321 U.S. 1, 7, 64 S.Ct. 397, 88 L.Ed. 497 (1943). Snowden further affirmed the view that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause." 321 U.S. at 7, 64 S.Ct. at 400; Taylor & Marshall v. Beckham, 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187.

The Supreme Court in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), overturned the his-

---

1. In effect, Monroe v. Pape, overruled the provisions of Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1943) which held with reference to the equal protection clause at least, that an allegation of specific intent was necessary in a Sec. 1983 action. See Cohen v. Norris, 300 F.2d 24, at p. 29 (9th Cir. 1962).

torical notion that the federal courts could not inquire into apportionment systems for state legislatures. It held that a claim asserted under the Equal Protection Clause challenging the constitutionality of state apportionment of legislative seats on the ground that it debased and diluted the value of an individual vote, presented a justiciable issue cognizable before the federal courts. Since the present case under our ruling above, involves only the due process clause, as distinguished from the equal protection clause, the *Baker* case and its progeny[2] technically have no application to the issue at bar. However, *Baker* pointed out that in Taylor & Marshall v. Beckham, 178 U.S. 548, 20 S.Ct. 890, the Supreme Court held *on the merits* that defeated candidates in the Kentucky gubernatorial race, had suffered no deprivation of property without due process of law. And in a footnote the Court observed:

"No holding to the contrary is to be found in * * * Snowden v. Hughes, 321 U.S. 1, [64 S.Ct. 397, 88 L.Ed. 497]."

It appears to this Court that *Snowden* did not discuss the merits of the due process issue, but concluded as a matter of law that the right to hold state office is not a federal right, but only a concomitant of state citizenship. The plain language of *Snowden* has not been overruled. The apportionment cases do not do so even implicitly. It is clear that *Snowden* did not go into the merits of the due process allegation, even though the Supreme Court noted in *Baker* that the holding in *Snowden* merely reaffirmed Taylor & Marshall v. Beckham, which *did* go into the substance of that issue.

Therefore in our judgment, the last clear statement of the law on this issue is in *Snowden*.

Plaintiffs suggest that the recent case of Bond v. Floyd, 87 S.Ct. 339 (1966), furthers the argument that the right to hold state office is a federal right. In that case, a duly elected representative to the Georgia House of Representatives was excluded from membership in that body because of his statements, and statements to which he subscribed, criticizing the Federal Government's policy in Viet Nam, and the operation of the Selective Service laws. The Supreme Court held that Bond's disqualification because of his statements, violated the free speech provisions of the First Amendment as applied to the states through the Fourteenth Amendment, and thereby deprived him of his federally guaranteed right to free speech. In so holding, the Supreme Court was not holding that Bond was deprived of his federally guaranteed right to hold state office, but that his *state* right to hold state office was being denied because of an unconstitutional restraint upon his *federal* right of free speech, perpetuated under color of state law. We submit that the Bond case does nothing, as an explicit statement of the law, to undercut the vitality of *Snowden*.

All that might be said is that the drift of recent Supreme Court decisions seemingly could lead one to infer that sometime in the future, the *Snowden* position on the status of holding state office may be revised. As a lower court in the federal system, we would be presumptuous to hold in opposition to the express language of the *Snowden* case. Thus it is our opinion that plaintiffs cannot state a claim under Sec. 1983 since they assert a deprivation of a right, which under *Snowden*, is derived only from their state citizenship.

Nevertheless, because we heard considerable evidence bearing on the due process issue, we will proceed to elaborate our views upon the merits of the instant

2. See e. g. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1962); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1963); Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964), and numerous lower court decisions.

controversy. Although our procedure may be unorthodox and our further remarks only dictum, the manner in which the Board of Election Commissioners functions is of great importance to the public and to the structure of our democratic system. Since we heard voluminous evidence in this case, and since the issues are important, we wish our views to be known.

Plaintiffs have challenged the administrative procedure by which the Board makes its determinations as violative of the very essence of due process. It should be stated at the outset, however, that the Illinois Election Code in chapter 46, Secs. 10-3, 10-10, and the City & Villages Act, at Chapter 24, Sec. 21-28, provides a specific procedure for filing nomination petitions, and for the hearing of objections thereto.

Section 21-28 provides in pertinent part:

"All nominations for alderman of any ward in the city shall be by petition * * * All such petitions, and procedure with respect thereto, shall conform in other respects to the provisions of the election and ballot laws then in force in the city of Chicago concerning the nomination of independent candidates for public office by petition."

Section 10-3 provides the requisites for nomination of independent candidates, and Secs. 10-4 and 10-5 list the details which must be observed in completing a petition for nomination. Section 10-6 requires that petitions (including those for aldermanic candidates) must be filed at least 50 days prior to the day of election. In the instant case, the petitions were due by January 9, 1967, since the election was scheduled for February 28. Section 10-8 provides that nomination petitions are deemed to be valid unless written objection is made within 5 days after the last day for filing said petition. In this case that deadline was January 14. Within 24 hours thereafter, the Board is to transmit by registered mail a copy of any objection to the candidate whose petition is challenged.

Also within 24 hours thereafter, as provided by Section 10-10, the Board is to send a call by registered mail to each objector and the candidate whose petition is objected to, setting out the fact that the Electoral Board is required to hold a hearing upon the objections, and setting forth the date and place thereof. Also the Board must cause the sheriff to personally serve a copy of the aforesaid call upon the above-mentioned persons. The hearings are to be held not less than three or more than five days after the receipt of the objector's petition. In the instant case, the hearings were required to be held from January 17 to January 19. The Board is to adopt rules of procedure on the first day of the hearings. At the hearing the Board: (c. 46, Sec. 10-10, Ill.Rev.Stats.)

"* * * shall take up the question as to whether or not the certificate of nomination or nomination papers are in proper form, and whether or not they were filed within the time and under the conditions required by law, and whether or not they are the genuine certificate of nomination or nomination papers which they purport to be, and whether or not in the case of the certificate of nomination in question it represents accurately the decision of the caucus or convention issuing it, *and in general shall decide whether or not the certificate of nomination or nomination papers on file are valid* or whether the objections thereto should be sustained and the decision of a majority of the electoral board shall be final." (emphasis added.)

The above recitation is to illustrate the major statutory compunctions under which the Board must operate. Any constitutional objections to the statutory requisites cannot be considered by the Court at this time. The opinion of February 7, 1967, considered and denied all such objections. Thus, hypothetically, if the Board substantially complied with the statutes, plaintiffs can have no objections. Plaintiffs' case must be made, if it can, by proving that the Board's

procedures were in violation of the plaintiffs' constitutional guarantees of due process, and coincidentally in violation of the statutes as well.

■ A good exposition of the requisites of due process in administrative proceedings is found in Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964). The Court said:

"Due process in administrative proceedings of a judicial nature has been said generally to be conformity to fair practices of Anglo-Saxon jurisprudence, see Tadano v. Manney, 160 F.2d 665, 667 (9th Cir. 1947), which is usually equated with adequate notice and a fair hearing, see Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624 (1941). Although strict adherence to the common-law rules of evidence at the hearing is not required, see Crowell v. Benson, 285 U.S. 22, 48, 52 S.Ct. 285, 76 L.Ed. 598 (1932), the parties must generally be allowed an opportunity to know the claims of the opposing party, Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), to present evidence to support their contentions, see id. 304 U.S. at 18, 58 S.Ct. at 776, 82 L.Ed. 1129, and to cross-examine witnesses for the other side, Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949). Thus it is not proper to admit ex parte evidence, given by witnesses not under oath and not subject to cross-examination by the opposing party. Southern Stevedoring Co. v. Voris, 190 F.2d 275 (5th Cir. 1951); see Chin Quong Mew ex rel. Chin Bark Keung v. Tillinghast, 30 F.2d 684 (1st Cir. 1929). A fortiori, the deciding authority may not base its decision on evidence which has not been specifically brought before it, United States v. Abilene & So. Ry., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016 (1924); the findings must conform to the evidence adduced at the hearing, Tadano v. Manney, 160 F.2d 665 (9th Cir. 1947). Furthermore, the Supreme Court has said that an administrative order 'cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order * * *. There must be such a responsible finding.' SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)."

We now turn to plaintiffs allegations. Plaintiffs essentially object to the Board's procedure on the following grounds: (1) that candidates received inadequate notice of the nature of the objections, thus were unprepared to rebut them at the hearing; (2) that the rules of procedure were not promulgated until the first day of the hearing, and that even so, during the course of the hearings, Chairman Holzman changed his original rule that objectors must be present in person; (3) that the written objections, though sufficient if unverified, stood of their own weight as evidence and were not, for the most part, supported by any further testimony, and consequently the burden of disproving them was allegedly placed upon the candidate rather than leaving the burden upon the objector; (4) that in practice, the candidates were limited to 10 minutes to refute the objections, a wholly inadequate amount of time; (5) that candidates could not obtain copies of either their petitions or the objections once the hearings commenced, which effectively precluded any opportunity to refute the objections; (6) that although the rules of the Board required specific objections to be made, in fact if the Board while checking the objections against the official "binder" discovered that a signature was faulty for another reason, the signature was not counted even though not objected to for that reason by the objector; the basis for plaintiffs' complaint here is that since only those petitions objected to are subject to scrutiny, to be consistent, the Board should only uphold objections formally made by an objector, or should examine all of the petitions; (7) that candidates had no access to the official "binders" against which the nomination petitions were checked, and, therefore, had little opportunity to prepare a de-

fense to the charges made against them; (8) that the Board members did not personally compare the petitions against the binders but relied upon the reports of subordinates who did almost all of the checking, subject only to the supervision of the Board; (9) that candidates had no access to those reports and consequently have no knowledge of the reasons for which their petitions were rejected; (10) that such a decision-making process was based upon "ex parte" evidence not available for court review, and that candidates were not permitted to be present when the actual checking was done; (11) that the Board did not publish in advance its criteria for rejecting signatures, and since many nominators, who were obviously the same person appearing in the "binder" were rejected because they used their nickname, or omitted a middle initial, or for other technical reasons, candidates should have been apprised in advance of the Board's standards; (12) that many signatures were objected to several times and that all of the objections were counted and subtracted from the number of signatures, thus, in many cases duplicating the actual number of objections; (13) that the Board impounded the petitions and objections following the hearings.

For all of these reasons, plaintiffs insist that the hearings conducted by the Board were infected with such a profusion of procedural inadequacies and irregularities that the hearings were violative of elemental notions of due process.

■ Plaintiffs concede, of course, that our review of the Board's actions is limited. Section 10–10 of the statute provides that "the decision of a majority of the electoral board shall be final." Hence, we are not free to re-examine the decisions made by the Board to determine their accuracy, because the statute provides that the Board's decision is final. Our review is limited to an examination of the process by which the decisions were reached. The Illinois

courts have held that unless the decisions of the Board were "clearly fraudulent," reviewing courts have no jurisdiction to set them aside. People ex rel. Schlaman v. Electoral Board of Cook County, 4 Ill.2d 504, 509, 122 N.E.2d 532 (1955); Telcser v. Holzman, 31 Ill. 2d 332, 201 N.E.2d 370 (1964). Indeed in Coles v. Holzman, 55 Ill.App.2d 93, 100, 204 N.E.2d 162, 165 (1964), the Appellate Court said:

"We recognize, of course, that decisions may be unjust without being fraudulent and that decisions made in haste under the pressure of a congested calendar may be arbitrary. We recognize too that the law contemplates decisions based on the personal evaluation of the evidence by the board itself rather than on reports submitted to it by clerks who are assigned the task of checking questioned signatures against permanent registration cards. However, confronted as we are with the legislative interdiction that the decisions of the board are final, such decisions, unless 'clearly fraudulent,' cannot be reviewed. Relief from unjust and unfair decisions is presently confined to exceptional and extraordinary cases. The case at hand is not such a case for there is nothing in the record which shows that the decision of the board was clearly fraudulent."

See also Hatch v. Holzman, 55 Ill.App. 2d 168, 204 N.E.2d 157 (1965).

■ We believe that the "clearly fraudulent" language of those cases should not be binding upon us, since as a federal court in a non-diversity action, we should follow federal law regarding so-called "unreviewable actions." However, although the courts differ in expressing the latitude available in reviewing an action made final by statute, in practice that disagreement is of little substance.[3] What is important is that the courts apparently do have the right to review administrative action which supposedly is made "unreviewable" or

3. For example, 4 Davis, Administrative Law Treatise, Sec. 2802, p. 6–7, cites 9 standards of review applicable to administrative decisions made "final" by statute.

"final" by statute to insure basically that constitutional safeguards of due process are met.

■ The extent of that review has not apparently been expressly formulated by the Supreme Court in recent years.[4] In fact as Professor Davis points out, "the Supreme Court has never held that denial of a limited review is a denial of due process of law."[5] But, in practice such review is proper as numerous cases have held.[6] And with good reason. No administrative decision should be upheld if offensive to the requirements of basic fairness. We think the Supreme Court has expressed noteworthy explanations of the types of review that should be applied to "unreviewable" decisions.

In Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946) the Court said:

> "The provision making the decision of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes."

And in Heikilla v. Barber, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), in limiting the scope of review to procedural irregularities which violate the due process clause, the Court expressed the standard of review which we believe should be applicable to this case. Whether "clearly fraudulent" puts a lesser burden on the plaintiffs is academic in our opinion, for we think that where board action is of such character, it should be and would be set aside by this Court. Hence, with the above principles in mind, we will consider plaintiffs' objections to the Board's procedures.

■■ We think the Board substantially complied with the notice provisions of Sections 10–8 and 10–10. Not only did the Board send out notices of the call by registered mail, and sent out copies of the objections in most cases, but the sheriff's staff served personal notice of the date and place of the call upon the candidates. Although some candidates, notably plaintiff Hikawa, did not receive a copy of the objections prior to the hearing, notices of attempts to deliver were left at said candidate's residences. Although the candidates had little time to prepare defenses to the allegations, we think for the most part in this type of proceeding, the documents stand for themselves. In our opinion, although the time available to the candidates for preparation was limited, the Board complied with the statute and in this respect their action could not be classified as arbitrary and capricious.

■ That the originals of the nominating petitions and objections were unavailable after commencement of the hearings was unfortunate, but the Board's reason has a good deal of plausibility to it. No doubt the papers *were* needed during the hearings. Probably some procedure could have been devised to provide access to these documents but the failure to do so falls far short of an arbitrary abuse of power.

■ Likewise, is it unfortunate that no one has access to the "binders" with which the official comparison is made. No justification for this practice was offered. Especially is it unfortunate since apparently the latest "unofficial" poll lists deviate from the binder as to some names (probably a very small percentage). But this impediment to preparation likewise does not rise to the stature of a constitutional objection, in our estimation.

■ That the rules of procedure were promulgated on the first day of the hearing testifies only to the Board's compliance with Section 10–10. Furthermore, it was testified that the rules, printed up by the Board for distribution to any interested person, have been substantially the same for over 30 years. Were an element of surprise involved in this aspect of the case it would advance plain-

---

4. See 4 Davis, Administrative Law Treatise Sec. 28.18 p. 102.

5. Davis, id. Sec. 28.19 p. 106.

6. See fn. 3 supra.

tiffs' position. But in view of the instant facts, this objection is trivial.

■ Perhaps a more serious objection is that the Board did not make clear in advance its criteria for judging the sufficiency of signatures appearing on the nominating petitions. This is so because apparently a number of signatures were rejected for technical reasons, among them, failure to include middle initials and use of a "nickname" rather than the name officially appearing in the binder. Plaintiffs correctly argue, in our judgment, that if the name "Abraham L. Marovitz" appeared in the binder, the signature "Abraham Marovitz," or "A. L. Marovitz" should be regarded as that of a bonafide nominator, assuming the handwriting and address to be alike. Yet several examples of rejections for seemingly trivial technical reasons were illustrated at the trial, and the allegation was made that such instances were numerous. Defendant Canary testified that checkers were instructed to allow nominating signatures which deviated in only minor respects from the comparable signature in the binder. However, the candidates should have been advised in advance if insignificant technical excuses were to be used to disqualify nominators. Such a course of action need not be anticipated.

■ Yet the statutory provisions regarding adequacy of nominating petitions are clear, and it is not this Court's function to sit in review of administrative decisions made by the Board. Although we think the Board should not use trivial reasons to disqualify nominators, and should inform candidates in advance if it intends to do so, the failure to so publish rules for decision does not amount to arbitrary and capricious conduct of the magnitude necessary to grant plaintiffs' request for injunctive relief.

■ We think the Board complied with the statute with regard to receiving testimony during the hearing. As defendant Canary testified, the Board members considered the burden of proof to be on the objector to sustain his objection. The objector's petition was the major evidence to be considered. If his objections were not borne out when compared with the "binder," they were overruled. Thus even though candidates did not rebut the objections (and few did), if objections were found to be invalid when compared with the binder, they assertedly were not sustained. In a proceeding of this nature, where the documents are incredibly voluminous, it would be impractical at the least, in addition to being uncalled for by statute, to require each objection to be subject to individual scrutiny at the hearing. With three days for hearings available by statute and literally thousands of objections to consider, the only practical procedure was to do as the Board did,—that is, to check the objections against the "binder". And the rules of the Board were explicit; if the objector or his attorney was not present at the hearing, the objection was overruled.

We do not think the failure of an objector to personally testify deprived any plaintiff of a constitutional right. In fact, most of the objectors did appear even though for the most part, their attorneys spoke in their behalf. These hearings were not, in our opinion analogous to a criminal proceeding where the accused is entitled to face his accuser. In all cases, either the objector or his attorney appeared. The objections served as documentary evidence subject to checking and confirmation by the Board.

■ The complaint as to the ten minute suggested time limitation requires scant consideration. Only one candidate testified that he was "cut-off."[7] There was abundant testimony

---

7. That candidate was Robert Briscoe. His petition was disqualified *inter alia*, because the "3" in "3rd Ward" on his statement of candidacy (a requirement under the statute) was omitted. This Court ex-

amined the petition personally and it was abundantly clear to us that there never was a "3" in that blank. But Briscoe testified that the number was on the petition when he submitted it. At the

that each candidate received as much time as he needed to present his defense. It *is* unfortunate that time for preparation and time for hearings was so limited. The remedy for that is not here, however, but in the legislature, which has the power to amend the governing statute.

█ There is no question but that the statute requires nominating petitions to be rejected if invalid even though not specifically objected to. In Sec. 10–10 the Board's function is to *"decide whether or not the certificate of nomination or nomination papers on file are valid or* whether the objections thereto should be sustained * * *"* (emphasis added). This objection requires no more comment. We might add, however, that it would be ideal, if practically feasible, for the Board to consider every petition regardless of objection thereto. But the statute does not require such an effort. The Board has done what it is required to do in this respect.

█ That the documents were impounded following the hearings does not raise a constitutional objection, and it was never proved that the Board double counted any objections. In fact, Mr. Canary testified that the checkers were repeatedly instructed to avoid double counting. He stated that it definitely was Board policy to count only one objection per inadequate signature, regardless of the number of grounds relied upon to challenge such a signature.

█ Finally, plaintiffs object that the Board's decision making process, violated plaintiffs' rights because the Board members did not personally check every signature but relied upon authorized clerks to compare the petitions with the official "binder."

Plaintiffs assigned great weight to this objection during the trial. The interpretation of the Illinois Election Code made by the Illinois Appellate Court in Coles v. Holzman, 55 Ill.App.2d 93, 100,

204 N.E.2d 162, 165 (1964), serves as the basis for plaintiffs' position. The case states:

"We recognize too that the law contemplates decisions based on the personal evaluation of the evidence by the board itself rather than on reports submitted to it by clerks who are assigned the task of checking questioned signatures against permanent registration cards."

█ It is true that the concept of an "institutional" decision is one that has long plagued the field of administrative law. The ideal solution would be for each Board member to scrutinize each individual piece of evidence. However, in cases like the instant one, where the time and volume strictures imposed upon the Board are weighty, the practicalities of the situation must dominate. In considering such situations, the courts have devised the rule that the administrative officer involved must make his decision after a consideration of the evidence, but that in reaching a decision, he may rely in whole, or in part, upon reports prepared by his subordinates. Thus he need not personally read all of the evidence, but must "consider and appraise" the evidence. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) (the first Morgan case). That case also stated: "evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates." 298 U.S. at 481, 56 S.Ct. at 912.

Professor Davis states the current status of federal law on the point in his treatise:

"The law of the federal courts is entirely clear that deciding officers need not personally hear the witness testify but may base their decisions upon the transcript of testimony and upon reports of subordinates analyzing the evidence and making recommendations. The federal courts assert that deciding officers should develop their own

---

trial we indicated that Briscoe obviously was not telling the truth in so stating, on the basis of our visual inspection. We

find it odd that this plaintiff who seeks equitable relief comes into court with unclean hands.

understanding of the issues and of the relevant evidence, but they do not assert that deciding officers must personally read the transcript or any part of it; the requisite understanding may be based upon oral or written reports of subordinates. * * * The scattered state cases are mostly but not altogether in accord with federal law that the requirement goes to substantial understanding and not to mechanics."

In our judgment, the Illinois cases are generally in accord with the position taken by the federal courts. The applicable Illinois law was stated in Illini Coach Co. v. Illinois Commerce Commission, 408 Ill. 104, 109, 96 N.E.2d 518, 521 (1951):

> "The substance of these decisions is that parties before an administrative body exercising quasi-judicial powers are entitled to have that body base its decision upon facts disclosed by the evidence, and that a failure of such body to acquaint itself with the facts as revealed by the evidence, if proved, is sufficient ground to warrant setting aside its order."

That passage was quoted with approval in Des Plaines Currency Exchange Inc. v. Knight, 29 Ill.2d 244, 247, 194 N.E.2d 89 (1963). *Illini* and *Des Plaines* establish the view in Illinois that unless it is proved that the board failed to base its decisions upon the facts as disclosed by the evidence, its orders must stand. This should not be interpreted to require personal evaluation of all the evidence, but only that the board must make its decision after a consideration of the evidence including reports prepared by its subordinates. Hence if the above quoted passage from Coles v. Holzman, is interpreted literally, it is not only in conflict with firmly established federal law, but also overstates the amount of Board supervision required under Illinois law. We do not propose to follow the literal effect of its language.

█ In view of the statutory time limitations and the sheer bulk of material involved, we believe it would be physically impossible for the Board to personally consider each of the disputed signatures. It is clear that the evil sought to be avoided is the unlawful delegation of decision making power. However, where the actions of clerks do not have the effect of "making the decision" for their superior officers, reliance on their reports is warranted.

Defendant Canary testified very ably that the Board did everything within its power to insure constant supervision over the checking procedure. Board members were present continually during the process, constantly considering their subordinates' reports, occasionally doing random checking themselves, and repeatedly requesting the clerks to double check their work. The degree of supervision done by the Board was certainly more than adequate considering the time and volume pressures which it faced, and it would ill behoove this Court to hold that the Board was guilty of arbitrary and capricious actions.

█ Furthermore, it should be noted that the fourth Morgan case, United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), made clear that reviewing courts should not be permitted to look into the mental processes by which administrative officials reach their decisions. The Morgan case involved a full dress hearing before the Department of Agriculture. The statutory hearing procedure before the Election Commissioners is far less extensive. In spite of Morgan we heard testimony by Board members which discussed the process by which they reached their decisions. We did this to satisfy ourselves as to the adequacy of the hearing provided, but not to allow the plaintiffs to attack the decision making process as a ground for relief. In any event, the law is clear and we are satisfied that the Board members acted properly and within the law in allowing their deputized subordinates to do the work of actual comparison between the petitions and the binders.

In summary, plaintiffs have challenged the procedures employed by the Board of Election Commissioners in essentially three respects: first, that the notice provided was insufficient to allow adequate preparation for hearing; second, that the hearing itself lacked sufficient procedural safeguards to comply with established due process requirements; and third, that the decision making process of the Board provided inadequate safeguards to plaintiffs' rights.

After consideration of the plaintiffs specific objections both individually and collectively, we do not believe that plaintiffs have demonstrated a pattern of conduct by the Board which is violative of plaintiffs' alleged constitutional rights. To the contrary, from the testimony presented to us we believe the Board acted within the applicable statutory provisions governing its proceedings. The testimony of defendant Canary, a practicing lawyer for 35 years and a relatively recent appointment to the Board, was particularly instructive and credible as to the Board's operating procedures.

■ It should be recalled that merely because certain decisions made by the Board may have been wrong and perhaps unjust is not a ground upon which this Court can disturb the Board's decisions. We must find that the proceedings were so arbitrary, so capricious, and so discriminatory, as to be substantially lacking in procedural safeguards. The trial before this Court, concluded just two days ago, revealed that the Board complied with the relevant statutes and conducted hearings which afforded candidates a forum and the right to present whatever evidence they desired. Hence, we must conclude that plaintiffs have failed to satisfy the burden of proof imposed upon them in this case. In addition it is appropriate to note that despite being given the opportunity, plaintiffs not once proved before this Court that any of the disputed nomination petitions were adequate enough to satisfy the requisites of the Illinois Election Code. Thus we hold that even if the *Snowden* case did not interpose a bar to our consideration of the merits of this issue, plaintiffs' request for relief would still be unavailing.

■ We feel obliged to point out, however, that plaintiffs did succeed in illustrating to this Court some of the weaknesses in the manner with which the Board undertakes its duties, conscientious as it professes and appears to be. Seemingly it is the unstated Board policy to compel petitioners generally to strictly comply with every statutory requirement. As a result and in apparent good faith, technical grounds are often utilized to disqualify nominating petitions. For the most part such action is statutorily on impeccable ground. But from what we could tell, although not a reason for relief in this action, by a zealously restrictive reading of the statute the Board apparently makes it exceedingly difficult for a candidate to qualify his name for a place on the ballot. The restrictive provisions of the election laws are responsible in part for this tendency. Certainly the law could be amended to extend the various time limits, and to make clear that the provisions of Secs. 10–1 to 10–10 should be interpreted liberally, as we believe they should be interpreted. Most certainly, those provisions should not be construed in a fashion which discourages candidates or causes them to become cynical of the process. In our judgment, the election laws should be expanded to add a degree of flexibility which is now lacking, and which is sorely needed to cope with situations like the case at bar, where the Board was inundated with nomination petitions and objections, which by statute had to be heard within three days.

It is highly desirable in our judgment, that the Board make a conscious effort to refrain from disqualifying signatures for mere technical reasons. Some such instances were cited to the Court by plaintiffs. Such an approach is destructive of the democratic process in the

long run. We believe that every citizen should be encouraged to run for office, or to enter public service. The attitude apparently now entrenched at the Board of Election Commissioners causes an opposite reaction. Cynicism regarding the Chicago political climate has long been an established viewpoint, held by a segment of the public in this area. Most of that distrust could be alleviated if the Election Board would adopt a more liberal attitude toward the filing of nomination petitions. Although plaintiffs have not made out a case for relief on constitutional grounds in this cause, their suit served the excellent educational function of probing the Board's activities, and for this we salute them. Although in fairness to the Board, we believe the quality of work which it does is excellent, and indeed is done conscientiously, we also believe a change in attitude on its part is of the highest urgency. We urge the Board, composed as it is, of representatives of both of our major political parties, to view our advice in a constructive vein, and with the understanding that a vital public interest is at stake.

In accordance with this opinion, we hereby deny plaintiffs' petition for temporary, preliminary and mandatory injunctive relief. We likewise hold against the plaintiff candidates on Count II and deny their claim for damages.

Although the plaintiff voters have not as yet proffered any evidence, in light of our above findings, we fail to see how they could prove their allegations herein, unless surprising additional new evidence, not available to us in the instant hearing, could be presented. Thus unless the plaintiff voters presently advise the court that they have additional evidence of a different nature than presented during the recently completed hearings, we will deny their petitions for relief, as well.

This memorandum should be considered to embody the Court's Findings of Fact and Conclusions of Law.