**Samuel J. VANDROSS, Plaintiff,**

v.

**James ELLISOR et al., Defendants.**

**Civ. A. No. 72-676.**

United States District Court,
D. South Carolina,
Columbia Division.

Aug. 10, 1972.

Thomas D. Broadwater, Columbia, S. C., for plaintiff.

Daniel R. McLeod, Atty. Gen., of South Carolina, C. Tolbert Goolsby, Jr., Asst. Atty. Gen., Columbia, S. C., M. C. Woods, Jr., Marion, S. C., and John A. Hagins, Jr., Greenville, S. C., for defendants.

## ORDER

HEMPHILL, District Judge.

Plaintiff, Samuel J. Vandross, a resident of Marion County, South Carolina, in this action originally filed June 15, 1972 [1], seeks to have his name, as a candidate for nomination to Senate Seat No. 2 of Senatorial District No. 11 of South Carolina, printed upon the ballot to be used in the Democratic Party Primary Elections, now scheduled for August 29, 1972. The defendants include James B. Ellisor, Executive Director of the South Carolina State Election Commission, Willie Marvin Lane, Clerk of Court of Marion County, South Carolina, the South Carolina State Democratic Ralph Gasque, a resident of Marion for the aforementioned Senate office, J. Ralph Casque, a resident of Marion County and the incumbent, and Allard C. Horne, a resident of Horry County.[2]

Following a declaration by a three-judge United States District Court that its new plan for the apportionment of the South Carolina State Senate was a valid plan, see e. g., Twiggs v. West, Civil Action No. 71–1106, the General Assembly, by joint resolution designated Monday, May 29, 1972, at 12:00 o'clock Noon as the time when entries were to open for those who wished to file for nomination and election to the State Senate or House of Representatives. Saturday, June 3, 1972, at 12:00 o'clock Noon was designated as the time when those entries were to close. See Joint

---

1. An amended complaint was filed July 28, 1972.

2. Originally, only Ellisor, Lane, and O. Frank Thornton, the Secretary of State of South Carolina, were named defendants. Upon the motion of Ellisor, the Secretary of State was dropped as a party defendant and the others were added. By

Order of July 28, 1972, when the two present candidates were added, provision was made that their failure to respond (in view of the time involved) would be considered a general denial and not a default. On August 9, 1972 this court received an *ex parte* letter from candidate Horne waiving any objection to putting Vandross on the ballot.

Resolution Ratification No. 1437 (May 25, 1972).[3] Persons who desired to be nominated and elected to those offices had been prevented, up until then, by court order from filing for those offices. The United States District Court in the Senate and House reapportionment cases had enjoined, as it related to the offices of State Senator and Member of the House of Representatives, the enforcement of Section 23–396 of the South Carolina Code of Laws, a statute which, ordinarily, sets the time for entries by candidates into party primaries. See e. g., Twiggs v. West, supra; Stevenson v. West, Civil Action No. 72–45.

Insofar as the office of State Senator is concerned, the basic filing requirements were not altered. Only the time for filing was changed. For the 1972 elections, as well as for elections conducted in past years, one who desired to be a candidate for nomination and election to the State Senate in a multi-county, multi-member senatorial district was required, among other things, to file a "notice of candidacy" and a prescribed campaign pledge with a specified party official. Code of Laws of South Carolina, Cumulative Supplement § 23–400.73 (1962)[4]; See also, Code of Laws of South Carolina, Cumulative Supplement § 23–400.72 (1962). Such a person was further required to file with the State Election Commission an "intention of candidacy." Code of Laws of South Carolina, Cumulative Supplement § 23–285 (1962).[5] The notice of candidacy, the campaign pledge, and the intention of candidacy were all required to be filed with the appropriate official by a prescribed deadline, see Code of Laws of South Carolina, Cumulative Supplement § 23–396 (1962), which for the 1972 elections was 12:00 o'clock Noon Saturday, June 3, 1972. Notice of candidacy, campaign pledge, and notice of intention of candidacy were all required only as to multi-county senate district filings.

Although he had been thinking of running for the State Senate for over a year, the plaintiff waited until the last possible day to attempt filing for a Senate office. At 10:12 a.m. on the morning of June 3, 1972, the plaintiff filed with Willie M. Lane, the Secretary and Treasurer of the Marion County Executive Committee of the Democratic Party in Marion, South Carolina, a campaign pledge and a notice that he was a candidate for Seat No. 2 of Senatorial District No. 11, a multi-county, multi-member senatorial district composed of Florence, Marion, Horry and Williamsburg Counties and assigned four Senators by the Reapportionment Act; he also paid a required filing fee of Two Hundred Fifty ($250.00) Dollars; local party rules in Marion County required this. He made no protest of this fee, which had been paid also by the other candidates. See Act bearing Ratification No. 1342 (May 6, 1972); 57 Stat. Act No. —— (1972). Later that day, he attempted to file an intention of candidacy with the State Election Commission in Columbia, South Carolina. The Executive Director of the State Election

---

3. Section 3 of the Joint Resolution reads: "The entries for those wishing to offer for nomination in such party primary shall open at noon on the fifth Monday in May and shall close at noon on the first Saturday in June; provided, however, this provision shall apply only to the periods for filing for the offices of State Senator and Member of the House of Representatives."

4. "Every candidate for selection in a primary election as the nominee of a political party for the office of State Senator shall file with and place in the possession of the county chairman of the county in which he resides, or such other officer as may be named by the county committee of the county in which he resides, at the same time as those wishing to offer for nomination in such primary for county-wide or less than county-wide office, a notice or pledge as required by § 23–400.-72."

5. "Each candidate for the office of State Senator in [a multi-member, multi-county district], regardless of political party affiliation, shall file his intention of candidacy with the State Election Commission . . . within the same period of time for filing as provided for such office in § 23–396. . . ."

Commission, the defendant Ellisor, would not accept it for certification to the Democratic Party; he positioned that the plaintiff did not enter the Commission's offices to file an intention of candidacy until after the filing deadline. Plaintiff, on the other hand, asserts that he went into the Commission's offices three minutes before the Noon deadline but was unable to reach the desk in the main lobby of the Commission's office in Columbia in order to file an intention of candidacy because a large crowd had gathered around it. Plaintiff demands, as was noted above, that his name be included as a Senate candidate on the election ballot and, in the event this court refuses to order the certification of his candidacy, the return of the Two Hundred Fifty and No/100 ($250.00) Dollars paid by him to the defendant Lane as a filing fee.

At a hearing in Greenville August 7, 1972, the parties agreed that all discovery is complete. The court was asked to proceed on the record now before the court. Among the depositions examined were those of: plaintiff Samuel J. Vandross; Vandross' driver Ernest D. Hendley; Solicitor William H. Ballenger of Anderson, South Carolina; Robert C.

Snowden, a black man who had qualified as an indigent candidate for Seat No. 1 of Senatorial District No. 7 (Chester, Fairfield and Richland Counties of South Carolina); Mervine Solone, a black man who had filed as a candidate for Seat No. 2 of Senatorial District No. 7; A. W. (Red) Bethea, candidate for the Senate in Senatorial District No. 9; Jimmy Martin, candidate for Seat No. 4 in Senatorial District No. 8 (Lexington, Aiken, Bamberg, Barnwell and Edgefield Counties—called by Martin "The Big Monster"); defendant James B. Ellisor; defendant Willie Marvin Lane; Mrs. Delores C. Wolfe, Secretary to Mr. Ellisor; G. Kent Krell, a reporter for *The State* newspaper, Columbia, S. C.; and Mrs. Laura Medlock, wife of a candidate who is unopposed. These deposed citizens were in the office of the Election Commission when the controversial events here involved took place.

## JURISDICTION

Initially plaintiff seeks (by his complaint) the jurisdictional umbrella of this forum under provisions of 28 U.S.C. § 1343(3) or (4) [6], also claimed application of 42 U.S.C. § 1973c [7], the Due

---

6. The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote. [Note] The complaint did not designate the subsection of the statute, and the court must surmise application of either (3) or (4).

7. Which provides: Alteration of voting qualifications and procedures; action by state or political subdivision for declaratory judgment of no denial or abridgement

of voting rights; three-judge district court; appeal to Supreme Court.

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States

Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1985(1) [8] and 42 U.S.C. § 1986[9]. At the hearing held at Greenville (because the court was there sitting at a criminal term), plaintiff claimed jurisdiction under provisions of 42 U.S.C. § 1983.[10]

Plaintiff's only possible vehicle by which to attain jurisdiction is the familiar 42 U.S.C. § 1983. This court, however, is of the opinion that the right or claim alleged to have been violated in this case does not properly fit within the scope of Section 1983 and, therefore, the complaint does not state a claim upon which relief can be granted. It is apparent that the basic right asserted and the core issue raised involves the opportunity to become a candidate for State office and is not a right which rises to federal protection. In Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88

District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice or, procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

8. 42 U.S.C. § 1985(1) provides: Conspiracy to interfere with civil rights—Preventing officer from performing duties.

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

9. 42 U.S.C. § 1986 provides: Same; action for neglect to prevent.

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

10. 42 U.S.C. § 1983 provides: Civil action for deprivation of rights.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

L.Ed. 497 (1944), a case which also concerned candidates for State office, the court stated:

> The protection extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law. Slaughter-House Cases, 16 Wall. 36, 74, 79 [21 L.Ed. 394]; Maxwell v. Bugbee, 250 U.S. 525, 538 [40 S.Ct. 2, 5, 63 L.Ed. 1124]; Prudential Insurance Co. v. Cheek, 259 U.S. 530, 539 [42 S.Ct. 516, 520, 66 L. Ed. 1044, 27 A.L.R. 27]; Madden v. [Commonwealth of] Kentucky, 309 U.S. 83, 90–93 [60 S.Ct. 406, 409, 410, 84 L.Ed. 590, 125 A.L.R. 1383]. The right to become a candidate for state office, like the right to vote for the election of state officers, Minor v. Happersett, 21 Wall. 162, 170–178 [22 L.Ed. 627]; Pope v. Williams, 193 U.S. 621, 632 [24 S.Ct. 573, 575, 48 L.Ed. 817]; Breedlove v. Suttles, 302 U.S. 277, 283 [58 S.Ct. 205, 208, 82 L.Ed. 252], is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause.

> \*   \*   \*   \*   \*   \*

> Nor can we conclude that the action of the State Primary Canvassing Board, even though it be regarded as state action within the prohibitions of the Fourteenth Amendment, was a denial of the equal protection of the laws. The denial alleged is of the right of petitioner to be a candidate for and to be elected to public office upon receiving a sufficient number of votes. The right is one secured to him by state statute and the deprivation of right is alleged to result solely from the Board's failure to obey state law. There is no contention that the statutes of the state are in any respect inconsistent with the guarantees of the Fourteenth Amendment. There is no allegation of any facts tending to show that in refusing to certify petitioner as a nominee, the Board was making any intentional or purposeful discrimination between persons or classes.

The plaintiff in the case at hand attempts to assert the right to be a candidate for state political office, a right which is incident to state citizenship and not federally protected or guaranteed. Synder v. Swann, D.C., 313 F.Supp. 1267 (1970); Bacon v. Holzman, D.C., 264 F. Supp. 120 (1967); Heiser v. Rhodes, D.C., 305 F.Supp. 269 (1969).

Despite this court's conviction that jurisdiction does not exist, in the light of those judicial bombshells by which appellate courts, in the past, have used judicial fiat to enlarge and abort the limited federal jurisdiction originally intended by Congress, this court will treat the issues as and if jurisdiction existed.

## CONSPIRACY

In his original complaint plaintiff accused defendants Lane and Ellisor as having "conspired to prevent your plaintiff from exercising the rights guaranteed him under the Constitution and the Statutory Laws of the United States of America." At the Greenville hearing plaintiff's counsel admitted the record contained no evidence of conspiracy.

## THE FAILURE TO FILE ON TIME

■ In considering the action which centered around the Election Commission Offices, 2305 Devine Street, Columbia, S. C., before and after Noon on June 3, the court finds that Vandross knew the impact of the day and the hour.[11] He

---

11. From the deposition of plaintiff taken July 13, 1972.

   Q. Now, on the morning of June 3rd, you knew at that time that was the last day, did you not?

   A. (Vandross) Well, we knew that, yes.

   Q. Did you know what hour?

   A. Twelve Noon.

called County Clerk Lane shortly after nine o'clock and appeared at his office about 9:34 a. m. He "finally put the money up", signed the notice and pledge, but did not check the time until he left the office,[12] and left Marion for Columbia. His best claim is that when he walked through the door of the Election Commission Office in Columbia it was "about two and a half minutes to twelve." [13] Unfortunately, his testimony does not agree with the overwhelming majority of others (most of whom are neither parties to this action or have any apparent interest in the outcome of it). He had the money on the Friday preceding the Saturday and admittedly could have filed as an indigent, but did not.[14] Vandross' driver stated he left the plaintiff out of the car, in front of the building, at 11:57 a. m. The issue becomes one of credibility, with no reflection on any of those deposed; one could simply be mistaken. It is obvious plaintiff was mistaken about the time.

The testimony of Ellisor, which this court finds credible and corroborated, can well be quoted here:

Q. (By Mr. Goolsby) Did you do anything with respect to making any announcement whatsoever as the hour of twelve o'clock noon approached?

A. Yes, I did. At four minutes until twelve, according to the clock on the wall that we had just set, I went outside the front door of the office building, on the little stoop, and declared publicly to anyone who was there, in and around the premises, that it was four minutes until twelve o'clock and anyone who desired to file for the office of State Senate had four minutes in which to do so.

Q. Who do you recall, Mr. Ellisor, was outside at the time that you made that announcement?

A. Right outside the door, on the sidewalk, there were three gentlemen, two of whom I did not know; the third one was Mr. Jimmy Martin, a former member of the State House of Representatives and now a candidate for the office of State Senate. And they all heard me when I said it, and I said it in a very loud voice. Anyone who was around had to hear it.

Q. Well, after you made the announcement outside, what did you do?

A. I went back inside the door, and we had some last-minute filings.

Q. Who?

A. Mr. Howard Ballenger, who I mentioned earlier, filed at eleven fifty-nine, and also Mr. John Pracht, from Anderson County, filed at eleven fifty-nine. They were the last two gentlemen to file. And there was no one else there at that time to file. Everybody who wanted to had an opportunity and filed.

Q. What occured at twelve o'clock? What did you do at that time?

A. At twelve o'clock, as I mentioned before, Representative Medlock pointed to the clock, and I announced inside the office that the time fixed for filing had closed, for the office of State Senate, that it was twelve o'clock noon.

Q. At any time prior to twelve o'clock did you see the person whom you later learned to be Mr. Vandross, the Plaintiff in this case?

A. No, sir, I did not.

---

12. [Ibid]
   Q. Do you know approximately what time it was?
   A. Well, to be frank with you, once inside of the office we didn't think about checking the time until we were out of the office and gone, on the way to Columbia.

13. Vandross deposition, page 35.

14. Ibid. p. 38.

Q. At any time after twelve o'clock, did you see Mr. Vandross?

A. Yes, I did.

Q. Will you tell us about that, Mr. Ellisor?

A. At exactly twelve o five p. m., Saturday, June 3rd, 1972, the Plaintiff, Mr. Vandross, walked through the front door, and I greeted him as he walked through the front door. I asked him if he wished to file for the office of State Senate, and he said he did. I told him how sorry I was that I could not accept his filing, because it was twelve o five PM, and I took him over to the clock and let him see for himself that it was twelve o five PM. And that's the first time I saw Mr. Vandross.

Q. Had any other blacks either filed or attempted to file for the office of State Senator, either earlier that day or on the other days?

A. Yes, we had a number of black candidates to file, as indigents and paying the filing fee.

Q. As indigents?

A. Yes.

Q. Who were some of those that filed as indigents?

A. Mr. John Roy Harper, II, who is the Chairman of the United Citizens Party of South Carolina, a practicing attorney.

Q. Filed as an indigent?

A. Filed as an indigent. We had another gentleman, by the name of Sohone, who filed as an indigent; and there was another; I don't recall his name right offhand. And we had several other blacks who filed and paid the filing fee.

Q. Do you recall Samuel Sanders?

A. Yes. Mr. Sanders was here and filed, and he paid the filing fee, paid it in cash.

Q. Mr. Sanders is a black male, and he paid the filing fee; Mr. Harper is a black male, and he did not pay the filing fee. And Mr. Sohone is a black male; did he pay the filing fee?

A. No, he filed as an indigent. I don't have my record right here, but there was another black candidate who came in with Mr. Sohone and also filed. I think his name was Snowden.

Q. This person whose name you think was Snowden and Mr. Sohone, did they file on Saturday?

A. Yes, they did.

Q. What about Mr. Sanders? Did he file on Saturday?

A. Yes, about, I'd say, ten or fifteen minutes before the filing closed.

Q. And the indigent attorney, when did he file?

A. He filed the day previous to that, as I recall; after five o'clock, I think, on Friday; Thursday or Friday.

Q. Well, when you showed Mr. Vandross the clock on the wall, did you engage in further conversation with him?

A. Yes, I did.

Q. Do you recall the substance of that conversation?

A. Basically it was that under the law I had no authority to accept him as a candidate after twelve o'clock noon, that that was the deadline fixed by statute and I could not accept it. However, if he wanted to, I'd let him go ahead and fill out the forms, like everyone else had, and pay his deposit of five hundred dollars, and I would take it and hold it. And I told him at that time if he got an order of any court directing me to accept him as a candidate and certify him, I would. He said, "Well, I don't have five hundred dollars." I said, "Well, sir, would you like to try to give five hundred dollars?" I said, "I'll wait here as long as necessary." And I took him into a separate office and said, "You're welcome to use

my telephone." In fact, I tried to call his attorney for him.

Robert C. Snowden, a black candidate, was present at 11:55 (when his filing was complete, left at 11:57 or 11:58 a. m.) and testified:

Q. And you had no difficulty at all in filing your notice of candidacy?

A. No, because there wasn't any congestion and there wasn't anybody in front of us so when we went in everything was cut and dry, signing in and filling out the affidavits.

He testified he was assisted by party officials in his filing.

The testimony of Mervin Solone, a black candidate is of the same impact.

Mrs. Laura Medlock, whose husband had filed, was standing in the Commission Office when the clock showed Noon. She had arrived at 11:45 to see if anybody had filed against her husband. She made pictures of her husband and son pointing to the clock with glee when filing time expired and he had no opposition. Her testimony, when being cross-examined by Mr. Goolsby is significant as to Vandross:

A. There were a lot of black males in that office, but the one you're referring to came in after 12:00 and the way I know it is when 12:00 came my husband shouted: No more filing, 12:00, and just a few minutes after that a very nice-looking black man in a black suit and white shirt came to the door and someone said: Here comes somebody who looks like they are going to file. And Mr. Ellisor said: I hate to do this, but I will have to tell him it is after 12:00. So that is the only reason I remember it. I was real impressed with how nice he looked and I felt sorry that he came so close, but it was after 12:00.

Plaintiff relies heavily on the testimony of A. W. (Red) Bethea [one of the more colorful political personalities of the State], and this court, upon examination of his testimony finds the answer:

A. As far as my watch was concerned he was inside the door at about twelve o'clock, and I will use the word "about", as I cannot swear to seconds. Gentlemen, this thing is hairline—a quarter of a second—thirty seconds, or something like that—I could not swear either way. I think he was in there. He was inside as far as my watch was concerned, but I am not sure about the clock on the wall as we could have varied a half a minute.

This court is not engaged in the business of splitting hairs. It must say whether it believes Mr. Ellisor's version or Mr. Vandross'. The credible evidence overwhelmingly favors Ellisor's.

Significant is the testimony of a newspaper report, Krell, who cannot be said to be other than impartial. Krell testified:

Q. Would you please explain the circumstances surrounding your notice of this particular individual on this date?

A. I recall, on the basis of the clock in the lobby, that as it reached noon, Mr. Ellisor—James Ellisor or somebody else in the lobby—said that the filing deadline had arrived and passed. Then several minutes went by, and at approximately four to five minutes after twelve a gentleman, who I later learned was Mr. Vandross, entered the Election Headquarters and in a matter of a few seconds announced generally to somebody that he wanted to file for the State Senate and was told, as I recall, by Mr. Ellisor that he unfortunately was too late. This, as I say, was about five minutes after twelve.

Q. Do you recall seeing any other black candidates in the general vicinity at that particular time?

A. As best that I can recall, there were some black individuals, and I assume they were black candidates, still in the lobby or in one of the side rooms about that time. Who they were, I don't know.

Q. Did you write an article on this particular event, especially relating to this particular incident of the late filing of this individual?

A. The mention of it is at the bottom of a lengthy story that appeared in *The State* newspaper of June 4.

Q. Would you please describe the conditions surrounding the desk where a person had to file, at about the time of the twelve o'clock deadline?

A. As best that I can recall, there were about seven or eight people in the lobby, around the desk, and I would not consider it a crowded situation. There was plenty of room for people to move around without having to barge past or shove their way past anyone.

Q. So, in other words, you are saying that the conditions were not such around the desk that if a person wanted to file he could not file without pushing and shoving or something of this nature?

A. That's right. He could have moved from the door to the desk without having to push his way past anybody.

Q. Do you recall whether or not Mr. Ellisor had made any announcement prior to twelve o'clock on that date, notifying the people of the time drawing to a close?

A. All I can recall is that he would look at the clock from time to time, in the lobby, and say, "Three minutes to go," or something like that. He didn't do that very often.

William H. Ballenger, Solicitor of the Tenth South Carolina Judicial Circuit, seeking a State Senate seat, was present, and a candidate. He testified that he filed at 11:59 a. m. and:

Q. At the time that you filed, did you see Mr. Vandross, who is the gentleman seated to the right of Mr. Broadwater?

A. Not at that time, no.

Q. Did you see him at any time that particular morning?

A. Yes. Before they finished closing, they announced, "Is there anybody that intends to file? Let them sign this sheet; that's the first thing."

Q. Who is "they"?

A. Mr. Ellisor did that.

Q. Where did he make that announcement?

A. He was standing at the edge of the desk, below the clock on the wall. That was done at least two times that I know of, and one just before the closing. It was my understanding that if you signed that, then even though, in the process of filing, if you went over the time, you were still there. As far as I know, I was the last one to file, as far as I know, because it was at the very last minute. They announced that the time was drawing very close to closing, and then they stated that it was closed, that it had reached the twelve o'clock hour. At that time there was some seven or eight people in the room, not bunched up around the desk. Mr. Bethea was there; John Pracht was there; Jack Wright was there; my young son, who is a student here at Carolina, was there. I stayed in the room for, oh, I'd say a minute or so after the closing.

Q. Well, up until this point was Mr. Vandross in the room?

A. He was not.

The deposition of Mrs. Wolfe and others verify that just prior to 12:00 o'clock noon, Mrs. Wolfe called the local time service and learned that the time was 11:54 a. m. The Commission's clock was adjusted, and everyone synchronized their watches to await the deadline. At four minutes until twelve, Ellisor went outside the office building and announced publicy to anyone who might be present and desirous of filing for the State Senate that the time was 11:56 a. m. and that anyone wanting to file had four minutes within which to do so. Upon making the announcement, he returned inside in order to take care of last minute filings by Ballenger and John Pracht, a resident of Anderson County. Both Ballenger and Pracht filed at 11:-59 a. m., just one minute prior to the filing deadline. When noon arrived, Representative Medlock, who is a senatorial candidate, pointed to the clock and had his picture taken by his wife. Ellisor then announced that the time fixed by the General Assembly for filing for the office of State Senator had expired. At 12:05 p. m., Vandross walked through the main door of the State Election Commission and into the lobby. He was greeted immediately by Ellisor and was asked whether he desired to file for the State Senate. Vandross said that he did. After showing him the clock, Ellisor told the plaintiff that he had no authority to accept him as a candidate because it was past the filing deadline. Vandross, however, was permitted to fill out the necessary forms, and Ellisor attempted to call an attorney for him.

It strikes the court as rather strange that, if the plaintiff is to be believed, at the most important moment of the week, insofar as the State Election Commission was concerned, the very person responsible for the acceptance of Senate entries would not be among the several interested persons in the main lobby waiting the end of the filing period but would be in some back room. Also, it is difficult for this court to believe that Vandross was inside the main lobby for a four or five minute period before he received attention from the Executive Director, especially since there were only eight or nine persons in and about the lobby, one of which was a newsman, and the deadline was fast approaching.

This court, therefore, finds as a fact that the plaintiff proffered an intention of candidacy to the State Election Commission after the Noon deadline and not before.

The plaintiff further contends that, even if this court were to conclude that the plaintiff's intention of candidacy was submitted after the filing deadline, his candidacy nonetheless should still be certified because he substantially complied with all of the filing requirements for that office.

██ Statutes, however, which regulate the time for filing a declaration of candidacy are almost universally held to be mandatory; and a declaration that is filed too late is a nullity. 29 C.J.S. Elections § 114 at 286; 25 Am.Jur.2d Elections § 140 at 831; see also: Anno. 72 A.L.R. 290; Normandin v. Stark, 109 N.H. 148, 244 A.2d 821. The statute here principally involved, Section 3 of the Joint Resolution, employs mandatory language. It states that the entries for State Senator "shall close" on June 3, 1972 at 12:00 o'clock Noon; and the word "shall", of course, is equivalent to the word "must", Bateman v. Smith, 183 Tenn. 541, 194 S.W.2d 336, and is to be given an imperative construction. Clark v. Riehl, 313 Ky. 142, 230 S.W.2d 626; 39 Words and Phrases, Shall at 111. Here, then, the statute regulating the time for filing an intention of candidacy for the office of State Senator is a mandatory statute; and since the plaintiff's intention of candidacy was filed after the deadline, it had no legal effect.

This court recognizes that there are some cases which hold that where there are special circumstances or a special showing of excuse, a declaration of candidacy which is filed too late may be accepted nevertheless. See e. g., State ex rel. Huse v. Haden, 349 Mo. 982, 163

S.W.2d 946; see also 29 C.J.S. Elections § 114 at 287. But there are no special circumstances present in this case that would warrant this court to order the certification of the plaintiff's candidacy. No official misled him. See 25 Am.Jur.2d Elections § 140 footnote 18. The statutes which prescribed the method of filing for a Senate Office in a multi-county, multi-member district, though of recent origin, were not new. Only the statute which established the deadline for entries was entirely new, and it applied to all persons, not just the plaintiff.

Nor does the plaintiff really have a special excuse for filing late. Judicial notice is taken of the fact that the distance between Columbia and Marion is one hundred three (103) miles. See Map, South Carolina State Highway Department. This court believes the statement of the Commissioner of Agriculture, William L. Harrelson, that, ordinarily, the trip between Marion and Columbia takes about two hours by automobile. Despite this and knowing that the filing deadline was at Noon, the plaintiff did not choose to leave Marion until 10:12 o'clock that morning. (His driver says that they did not leave until 10:30 a. m.) The plaintiff and no one else made the decision to wait until the last day to attempt to file for a Senate Office. If there is a special excuse for the plaintiff's late filing, he is its author; and as such he cannot take advantage of it.

To wait until the last few hours to undertake complying with filing requirments for a political office is risky business. The plaintiff took a chance, and he lost. He could have filed earlier, but he did not. Because Vandross, not the defendants, is responsible for the dilemma in which he finds himself, this court cannot help him.

The plaintiff's prayer for relief, except as to the refund of the amount paid by him as a filing fee, is denied, his complaint is dismissed with costs to him. The caption herein be amended to reflect that the defendant Ellisor is the "Executive Director of the South Carolina State Election Commissioner" and not, as the plaintiff has described him, the "Commissioner for the South Carolina Election Commission." The sum of Two Hundred Fifty and No/100 ($250.-00) Dollars which Vandross paid as a filing fee shall be immediately refunded.

And it is so ordered.