Robert BRISCOE et al., Plaintiffs-
Appellants,

v.

Stanley T. KUSPER, Jr., et al.,
Defendants-Appellees.

No. 18390.

United States Court of Appeals,
Seventh Circuit.

Dec. 22, 1970.

Rehearing Denied Jan. 22, 1971.

David Long, Harry Golter, Brian Meltzer, Chicago, Ill., for plaintiffs-appellants.

William R. Ming, Jr., Sophia H. Hall, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

CUMMINGS, Circuit Judge.

Twelve of forty-six candidates barred from the ballots in the 1967 Chicago aldermanic election and nineteen registered voters who signed their nominating petitions filed this class action against the members of the Board of Election Commissioners of the City of Chicago. The action was predicated on the Civil Rights Act (42 U.S.C. § 1983) on the ground that plaintiffs had been deprived of rights, privileges or immunities secured by the Constitution. In its present posture, the gravamen of the amended complaint is that in refusing to place the names of these candidates on aldermanic ballots, defendants employed procedures denying plaintiffs due process and equal protection of the laws, as guaranteed by the Fourteenth Amendment.

Count I of the amended complaint sought declaratory and injunctive relief. Plaintiffs moved for the convention of a three-judge panel pursuant to the provisions of 28 U.S.C. §§ 2281 and 2284 to consider their constitutional objections to the Illinois Election Code. Ill.Rev.Stats. 1969, Ch. 46, § 10-1 et seq. The district court held that there was no substantial constitutional question and therefore denied the motion pursuant to the rule of Ex Parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152. Plaintiffs no longer seek injunctive relief against enforcement of any state law, and the matter is properly before this Court for consideration of the requested declaratory judgment. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 155, 83 S.Ct. 554, 9 L.Ed. 2d 644. Count II sought $100,000 damages for each plaintiff.

Count I received a 3-day bench trial at which the district court also considered prior testimony taken on plaintiffs' unsuccessful motion for a preliminary injunction, the depositions filed, and the uncontested facts contained in the pretrial order. At the close of plaintiffs' case, the court granted defendants' motion for findings and judgment in their behalf under Count I. The district court found that defendants' procedures violated neither the equal protection nor due process clauses of the Fourteenth Amendment. Summary judgment was granted for defendants under Count II, on the ground that "because of their official

position they [defendants] are immune from actions for damages on account of their official acts."

In order to resolve the contentions of the parties, it is necessary to consider the elaborate statutory machinery for the election of candidates for aldermen of the City of Chicago. Such an election is a non-partison one, with no party name appearing upon the ballots. Ill.Rev.Stats. 1969, Ch. 24, § 21–32. The Board of Election Commissioners of the City of Chicago is empowered to consider objections to nominations for aldermen. It sits *ex officio* as the municipal electoral board. Two of the three members are required to be selected from the two leading political parties of the State, one from each of those parties. Ill.Rev. Stats.1969, Ch. 46, §§ 6–22 and 10–9. Section 21–28 of the Cities and Villages Act regulates candidates' access to ballots in aldermanic elections:

> "All nominations for alderman of any ward in the city shall be by petition. All petitions for nominations of candidates shall be signed by such a number of legal voters as will aggregate not less than two per cent of all the votes cast for alderman in such ward at the last preceding general election. All such petitions, and procedure with respect thereto, shall conform in other respects to the provisions of the election and ballot laws then in force in the city of Chicago concerning the nomination of independent candidates for public office by petition. * * *"

Ill.Rev.Stats.1969, Ch. 24, § 21–28.

Article 10 of the Illinois Election Code (Ill.Rev.Stats.1969, Ch. 46, § 10–1 et seq.) specifically governs the nominations of independent candidates or candidates of minor political parties. Section 10–3 states that nominations of independent candidates for aldermen are to be made by nomination papers signed by "qualified voters" of the ward. That Section further provides that "[e]ach voter signing a nomination paper shall

add to his signature his place of residence, and each voter may subscribe to one nomination for such office to be filled, and no more." [1]

Section 10–4 spells out the formal details for nominating petitions. It also provides that the petition shall be signed by the qualified voters

> "in their own proper persons only, and opposite the signature of each signer his residence address shall be written or printed (and if a resident of a city having a population of over 10,000 by the then last preceding federal census, the street and number of such residence shall be given) * * *. Standard abbreviations may be used in writing the residence address, including street number, if any. No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with."

The Section additionally demands a signed certification by a qualified voter of the ward stating that the signatures on the sheet were signed in his presence, were genuine, and that they are otherwise adequate and regular. Finally, Section 10–4 specifies that the sheets containing nominating signatures.

> "before being presented to the electoral board or filed with the proper officer of the electoral district or division of the state or municipality, as the case may be, shall be neatly fastened together in book form, by placing the sheets in a pile and fastening them together at one edge in a secure and suitable manner, and the sheets shall then be numbered consecutively. The sheets shall not be fastened by pasting them together end to end, so as to form a continuous strip or roll. A petition, when presented or filed, shall not be withdrawn, altered, or added to, and no signature shall be revoked except by revocation in writing * * *."

---

1. These requirements have remained unchanged by either the Supreme Court's ruling in *Moore v. Ogilvie*, 394 U.S. 814,

89 S.Ct. 1493, 23 L.Ed.2d 1, or by the subsequent legislative amendments to this Section.

The time and manner for filing and handling nomination petitions are set forth in Section 10–6 of the Article. In the case of a Chicago aldermanic election, the nomination papers are to be filed with the Chicago Board of Election Commissioners, at least 50 days (now 64 days) but not more than 85 days (now 98 days) prior to the day of election. Under Section 10–7, all nomination papers "when presented or filed shall be open, under proper regulation, to public inspection," and the Board of Election Commissioners must preserve them not less than 6 months.

The Election Code next lays down the basic rules for the disposition of objections to nominating petitions. Section 10–8 permits "[a]ny legal voter of the political subdivision" to file an "objector's petition together with a copy thereof" to challenge the validity of any nominating petition "within 5 days after the last day for filing the certificate of nomination or nomination papers." The objector's petition is expected to reveal the identity of the objector, "the nature of the objections to the * * * nomination papers in question, and shall state the interest of the objector and shall state what relief is requested of the electoral board." Within 24 hours after receipt of the objector's petition, the board must transmit by registered mail the copy of that document to the candidate whose nomination is challenged.

Within 24 hours after receiving the nomination papers and the objector's petition, the Board of Election Commissioners is required by Section 10–10 to "send a call by registered mail" to the objector and candidate, with a copy of the call also served by the sheriff upon them. The call must state the day, hour, and place of the hearing on the objections, and the hearing must not be less than three nor more than five days after the receipt of the nomination papers and the petitions. On the first day of the hearing, the Board is required to "adopt rules of procedure for the introduction of evidence and the presentation of arguments." At the hearing, the Board is required to consider "whether the nomination papers are in proper form, * * * filed within the time and under the conditions required by law," and whether the nomination papers are genuine and valid. The Board must generally "decide whether or not the * * * nominating papers on file are valid or whether the objections thereto should be sustained * * *." At the time of the election presently before this Court, the decision of a majority of the Board was "final." However, in May 1967, this Section was amended to require the Board to make written "findings" and to "state in writing which objections, if any, it has sustained." At the same time, judicial review has been provided by Section 10–10.1 in the appropriate county circuit court upon petition by either the candidate or objector within 10 days after the Board's decision.

The 1967 aldermanic election was scheduled for Tuesday, February 28. Under the foregoing provisions of the Illinois Election Code, nominating petitions were due by Monday, January 9, and the deadline for objections was Saturday, January 14. The hearings were required to begin between Tuesday, January 17, and Thursday, January 19. The parties have cited no statutory deadline for the Board's decision, which was apparently made here on Saturday, January 21, which was seven days after the last objections were received and thirty-eight days prior to the election.

The twelve plaintiff candidates submitted timely voter petitions. In accordance with usual custom, the objections thereto were filed on the last two permissible days, namely, Friday and Saturday, January 13 and 14. They included objections to improper form of the nomination petition, invalidity of nominators' signatures, improper circulation of petition or invalid signature of circulator. Copies of the objections and call were sent by registered mail to the plaintiff candidates on Saturday, January 14, and received on Monday, January 16, except that plaintiff Lonski did not receive

his set until Tuesday, January 17. The calls were also served by the sheriff on or before Sunday, January 15.

The district court found that

"[b]ecause of the manner in which the Election Code has structured the time requirements for filing objections and notifying candidates of said objections as specified above, plaintiff-candidates and all other candidates in past elections held under Illinois law as referred to above did not, and will not under these laws, receive copies of objections to their petitions until the Monday before the Tuesday which is the first day of hearings on said objections." Finding 22.

After the Board heard objections to the nominating petitions, 25 seasoned clerks and two attorneys of the Board checked the petitions against its records, particularly the nominators' signatures in the precinct binder cards. The precinct binders and master file of voter registration cards contain the signatures of registered voters in Chicago and are kept in the Board's offices. The precinct binders contain the original voter registration cards by precinct and the master file contains alphabetized copies of such cards. The clerks used 9 abbreviations in making reports on the validity of objections.[2] These reports were noted on the nominating petitions, the objectors' peti-

tions or both. Defendants themselves conducted only random or spot signature checks with the precinct binders but were present throughout the checking process and usually approved the checkers' reports. In accord with Board policy, only one objection was supposed to be counted as to each assailed signature, but apparently on occasion signatures were invalidated for a reason different from the objectors'. Also, highly technical reasons were used in disqualifying some signatures.

Defendants did not permit the copying or inspection of nomination papers after Saturday, January 14, the last day for filing objections thereto. Only defendants and their employees were present when the signatures of the nominating petitions were compared with the signatures in the precinct binders. Candidates or their representatives were not permitted to be present during the checking of objections to the nominating petitions, nor were they permitted to see the precinct binders, master file, or checkers' reports.

At the January 17–19 hearings, the Board considered fifty-five objectors' petitions. Plaintiff candidates were permitted to appear alone or with counsel and were given a brief opportunity to discuss their nominating petitions and the objections thereto. The objectors

---

2. The nine abbreviations were as follows:
   "NIB: Name on candidate's petition not in precinct binder.
   "NR: There is no record of that being the name of a registered voter.
   "F: Forgery, denoting that the handwriting of name on candidate's petition is not the same as the handwriting of a person with the same name found in the precinct binder.
   "OW: Out of ward, denoting that the name on the candidate's petition at the address listed thereon is the name and address of a person who lives outside of the candidate's ward.
   "OK: Denotes that the objection to the signature was not sustained and that the signature on the candidate's petition is the signature of a registered voter in the candidate's ward.
   "WN: Denotes that the form of the signature on a candidate's petition is

different than the form of signature found in the precinct binder, but does not denote anything about the handwriting of the signature.
   "DUP: Denotes that the signature on a candidate's petition is also found on a nominating petition of another candidate for the same office in the same ward.
   "WA: Denotes that the address opposite the name on candidate's petition is different from the address found in the precinct binder for that name. The designation, wrong address, can mean either that the name on candidate's petition is the name of a registered voter at another address in candidate's ward or the name of a person residing outside of candidate's ward.
   "NI: Denotes that the signature on a candidate's petition lacks a middle initial."

or their attorneys also appeared. After the Board hearings, the completion of the checkers' reports and the Board's rulings thereon, plaintiff-candidates' nominating petitions were invalidated and on Saturday, January 21, 1967, defendants impounded the nominating petitions, the objections, and other related documents.

■ Although the aldermanic election that inspired this action has already taken place, that event did not moot this case. Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1; Shakman v. Democratic Organization of Cook County, 435 F.2d 267, 268 (7th Cir. 1970). The challenged practices of defendants may be deemed of a continuing nature, and nothing prevents rendition of meaningful relief. Cf. Brockington v. Rhodes, 396 U.S. 41, 43, 90 S.Ct. 206, 24 L.Ed.2d 209; Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214. Similarly, defendants do not contend that this Court is precluded from considering these claims as political questions. The plaintiffs present questions of due process as well as equal protection, and we see nothing in Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 et seq., or elsewhere to suggest that these contentions are nonjusticiable. Cf. Williams v. Rhodes, 393 U.S. 23, 28, 89 S.Ct. 5, 21 L.Ed.2d 24; Wesberry v. Sanders, 376 U.S. 1, 5–7, 84 S.Ct. 526, 11 L.Ed.2d 481. Accordingly, we turn to the merits.

### Equal Protection Claims

Plaintiffs assert that they were denied equal protection of the law because candidates with legally sufficient petitions were denied places on the ballot. They argue that this arbitrary misapplication of the state laws in itself constituted a violation of their rights to equal protection. We do not agree with this position.

■ The Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination rather than erroneous or even arbitrary administration of state powers. The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. See Snowden v. Hughes, 321 U.S. 1, 8–9, 64 S.Ct. 397, 88 L.Ed. 497. Plaintiffs here have failed to establish any classification other than the consequences of the Board's improper application of their powers. They have shown no racial or ethnic discrimination. Cf. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Cf. Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336. Nor have they claimed classification based upon geographical location or poverty. Cf. Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1; Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169. Plaintiffs have also failed to prove that the Board's actions reflected political discrimination based upon political beliefs or party affiliations. Cf. Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24; Weisberg v. Powell, 417 F.2d 388 (7th Cir. 1969). Accordingly, we agree with the district court that plaintiffs have not been denied equal protection under the Fourteenth Amendment.

### Due Process Claims

Plaintiffs also argue that they were denied due processes under the Fourteenth Amendment in several respects. They object to the Board's failure to establish and publish meaningful guidelines clarifying the petition requirements and procedures. They contend that the Board abided by no prior standards in disposing of objections to signatures, and they charge that defendants inconsistently and arbitrarily ruled on the validity of signatures on their petitions. In addition, plaintiffs assert that several procedural features of the statutory and administrative practices of the Board violated their right to a fair hearing.

### I

The district court, relying upon Snowden v. Hughes, 321 U.S. 1, 7, 64 S.Ct.

397, 88 L.Ed. 497, initially held that plaintiffs could not "state a claim under Sec. 1983 since they assert a deprivation of a right, which under *Snowden*, is derived only from their state citizenship." Bacon v. Holzman, 264 F.Supp. 120, at p. 125 (N.D.Ill.1967). Later, however, without discussion, the court concluded it did have jurisdiction but did not retract the previous ruling that a claim had not been stated under Section 1983.

In *Snowden*, the plaintiff claimed that the Canvassing Board of Cook County, Illinois, deprived him of due process by unlawfully refusing to designate him an official nominee for state political office. Designation as a nominee would have assured plaintiff of gaining office, and the Supreme Court viewed the case as involving that right. Without discussing the legality of the Canvassing Board's action, the Court dispatched Snowden's contention merely by stating that the

"unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause. Taylor & Marshall v. Beckham, 178 U.S. 548 [20 S.Ct. 890, 44 L.Ed. 1187]." 321 U.S. at p. 7, 64 S.Ct. at p. 400.

*Taylor & Marshall*, in turn, dealt with the claimed right to public office and concluded that it was neither a right of property or "any pre-existing right."

■ It is apparent from the opinions of the Supreme Court in both *Snowden* and *Taylor & Marshall* that the rights in question were presented as purely state rights to public employment and were narrowly considered. No attempt was made in those cases to weigh the implications of the impact of ballot designation upon the effective exercise of First Amendment freedoms applicable to state action under the Fourteenth Amendment. Such a distinction was noted in Egan v. City of Aurora, 365 U.S. 514–515, 81 S.Ct. 684, 685, 5 L.Ed.2d 741, where the Court stated that

"[i]nsofar as any right claimed stems from petitioner's status as mayor under Illinois law it is precluded from assertion here by Snowden v. Hughes, 321 U.S. 1 [64 S.Ct. 397, 88 L.Ed. 497]. But as we read the complaint, the rights which petitioner claims he was deprived of are those that derive from the Fourteenth Amendment, particularly the right of free speech and assembly."

In this instance, we perceive the complaint of these candidates and voters as transcending mere assertion of state-created rights. The thrust of their challenge to the Board's action rests upon the effect which denial of ballot placement has upon their enjoyment of rights of free association and petition for the redress of grievances. For this reason, and because of the developments in the body of constitutional law dealing with "political rights," we also conclude that Snowden v. Hughes does not preempt consideration of plaintiffs' constitutional due process claims. Cf., e. g., Ferguson v. Skrupa, 372 U.S. 726, 731, 83 S.Ct. 1028, 10 L.Ed.2d 93; United States v. White, 405 F.2d 838, 847–848 (7th Cir. 1969), certiorari granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559.

II

■■ It is by now well established that the concept of "liberty" protected against state impairment by the Due Process Clause of the Fourteenth Amendment includes the freedoms of speech and association and the right to petition for redress of grievances. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed. 2d 1488. These rights may take the form of creating political "parties," or of simple association for mutual political or social benefits, including support of independent candidates or specific policies. See NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325; United Mine Workers of America, District 12 v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426; Hadnott v. Amos,

394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24. Access to official election ballots represents an integral element in effective exercise and implementation of those activities. *E. g.,* Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336; Moore v. Ogilvie, 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24; cf. Weisberg v. Powell, 417 F.2d 388 (7th Cir. 1969).

■■ Such fundamental elements of "liberty" may be limited only where "a compelling state interest in the regulation of a subject within the State's constitutional power to regulate" exists. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405; cf. Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 et seq. A state clearly has a substantial interest in administering its own local elections. This state concern reasonably includes regulation of candidates, and it may well call for limitations on access to ballots by those seeking public office. Such limitations may be justified by the need to prevent subversion or corruption. In this instance, the chief purpose of the limitation is to reduce the electoral process to manageable proportions by confining ballot positions to a relatively small number of candidates who have demonstrated initiative and at least a minimal appeal to eligible voters. Assuming the constitutional legitimacy of such an objective, due process nevertheless requires that the state accomplish that end narrowly and fairly to avoid obstructing and diluting these fundamental liberties. See Williams v. Rhodes, *supra,* at pp. 32–33, 89 S.Ct. 5; Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231; Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 545, 83 S.Ct. 889, 9 L.Ed.2d 929; Staub v. City of Baxley, 355 U.S. 313, 322–325, 78 S.Ct. 277, 2 L.Ed.2d 302; cf. Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235.

## III

Plaintiffs' first and principal objection is that the Board's failure to issue guidelines clarifying the statutory standards for nominating petitions contravened due process. At the center of the controversy lies the Board's interpretation and application of two basic provisions of the Illinois Election Code. Plaintiffs do not presently challenge the constitutionality of these provisions. Nor do they claim that the Board's reading of those Sections imposed unconstitutionally technical requirements upon candidates. Rather, they argue that the Board violated due process by failing to give any notice to prospective candidates of the rigorous standards to be applied which were not specifically disclosed in the statute. The district judge disagreed and concluded that the statutory provisions were clear and that the failure to publish rules for decision did not render the Board's application of those Sections arbitrary or capricious.

The pertinent statutory requirements for these petitions are set forth in Ill. Rev.Stats.1969, Ch. 46, §§ 10–3 and 10–4:

"10–3. Independent candidates—Nomination papers.

\* \* \* \* \* \*

"Each voter signing a nomination paper shall add to his signature his place of residence, and each voter may subscribe to one nomination for such office to be filled, and no more \* \*."

"10–4. Petitions for nomination—Details.

\* \* \* \* \* \*

"Such petition shall be signed by the qualified voters in their own proper persons only, and opposite the signature of each signer his residence address shall be written or printed \* \*. Standard abbreviations may be used in writing the residence address, including street number, if any. No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the re-

quirements of this Section are complied with. \* \* \* ''

Prior to 1967, the Board had apparently considered the limitation on the number of nominating petitions which a voter might sign to be directory by nature and to have no effect upon the validity of the petition itself. Such a construction was presumably within the defendants' prerogative. Support for their interpretation could be derived from the statute's use of "may" rather than "shall" as used elsewhere in the chapter where the legislature indicated a mandatory rule was intended. Cf., *e. g.,* Ill. Rev.Stats.1969, Ch. 46, § 10–4. Their view was also consistent with the practical exigencies of petitioning, which would render it unfair to penalize a candidate for his inability to insure against multiple signings.

In 1967, seemingly for the first time, the Board voted 2–1 to change its position and sustain objections to signatures on the duplication ground. Despite the requirement under Section 6–26 of the Illinois Election Code (Ill.Rev.Stats. 1969, Ch. 46, § 6–26) that the Board "make all necessary rules and regulations \* \* \* with reference to the \* \* \* conduct of elections," no prior warning was given to potential candidates.

■ Regardless of whether the more restrictive position of the Board was statutorily or constitutionally valid, the application of the new anti-duplication rule to nullify previously acceptable signatures without prior notice was unfair and violated due process. In this instance, the former interpretation of Section 10–3 was not only reasonable, but it also represented the application of the statute least limiting to political association. An agency may be bound by its own established custom and practice as well as by its formal regulations. The Board may not deviate from such prior rules of decision on the applicability of a fundamental directive without announcing in advance its change in policy. This is especially true where, as here, fundamental, constitutionally protected liber-

ties are adversely affected, and those interested require certain knowledge of what is expected of them by the state. Until such time as the Board makes public its new determination, it is constitutionally prohibited from imposing that rule on unsuspecting persons.

Plaintiffs have also objected to the Board's failure to issue specific rules defining the meaning of the requirement in Section 10–4 that qualified voters must sign "in their own proper persons only." This phrase was read by the Board to require of each signature a full first name and middle initial. The Board thus disallowed signatures with only the first initial or nickname, as well as those which failed to include a middle initial. This was enforced regardless of whether the signature was genuine and verifiable by reference to the precinct binder or master voter registration lists.

■ Nothing in the statutory language suggests that such a restrictive interpretation was necessary or would be readily understood by the general public. The language might reasonably have been read as requiring only that the use of a "proxy" was prohibited, or that the signer was to affix his customary signature. The purpose of the requirement is to ensure that there is no forgery and to facilitate the Board in determining the petition's validity. While the requirements adopted by the Board may be reasonably directed toward achieving those ends, it is by no means clear that they are necessary or that uninformed candidates might anticipate their application. These requirements imposed added burdens largely beyond a candidate's control. We need not conclude that the statute itself fails for want of clarity in order for us to hold that such a rigid and technical interpretation by the Board may not be imposed in the absence of pre-existing regulations forewarning candidates. Cf. Baggett v. Bullitt, 377 U.S. 360, 377–378, 84 S.Ct. 1316, 12 L.Ed.2d 377; Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302; Gibson v. Florida

Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929; Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570, 578 (1964); United States v. Atkins, 323 F.2d 733, 743 (5th Cir. 1963). Lacking such advance clarification, we conclude that the Constitution permits enforcement of the statutory rule in only the least restrictive and most obvious manner.[3]

Plaintiffs also contend that their rights to procedural due process were denied by features of the administrative hearing conducted by the Board. Their first contention, of statewide magnitude, is that the notice provisions of Section 10–8 of the Election Code are inadequate. Section 10–10 additionally compels the chairman of the electoral board to send notice of the hearing, stating the day, hour, and place of the hearing. At the time of the election at issue in this case, as well as at the present time, the Board was required by Section 10–10 to hold its hearing no less than three and no more than five days after receipt of the objectors' petitions.

The heart of plaintiffs' contention, however, lies in the timing in existence when this suit arose. In 1967, the last day for filing nomination papers for aldermanic elections in Chicago always fell on a Monday, while the final day for objectors' petitions fell on the following Saturday. Objections to plaintiff candidates' petitions were filed on the last two days, Friday and Saturday, January 13 and 14, 1967. Because of the 24-hour limit, the Board sent the objections and notice of the hearing on January 14. Plaintiffs contend that because of this situation, they received no notice of the hearing until Monday, January 16. In each instance, moreover, the Board scheduled the hearing for the next day, Tuesday, January 17. Plaintiffs argue that this did not give them adequate notice, since they were unable to prepare

adequate defenses prior to that hearing date.

We cannot agree that the application of the statute's notice provision to these plaintiffs failed to satisfy due process in this case. The validity of the notice should be judged in light of the nature of the administrative proceedings which followed, the type of preparation necessitated, and the existence of prejudice to plaintiffs resulting from the short lapse of time between their notice and the actual hearings.

The administrative adjudication of the objections to plaintiffs' petitions was informal. In accordance with the dictates of Section 10–10 of the Election Code, the first order of the hearing was the adoption of "rules of procedure for the introduction of evidence, and the presentation of arguments * * *." These rules correspond to those applied by the Board in past years. They permitted time for argument and allowed testimony as well as the submission of affidavits. Most of the objections dealt with technical matters rather than challenges to the genuineness or authenticity of signatures such as would require evidentiary elaboration.

Although the time for preparation was limited, it does not appear that any plaintiff's petition was rejected because he was unable to appear at the hearing. No plaintiff was denied the opportunity to argue, submit affidavits, or otherwise present a case. Although the Board was under pressure of limited time, there is no indication that a reasonable continuance, where necessary, was denied. Under these circumstances, aside from their contentions regarding the adequacy of the hearing itself, we decline to hold that the notice was constitutionally deficient. Montana Power Co. v. FPC, 87 U.S.App.D.C. 316, 185 F.2d 491, 497 (1951), certiorari denied, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683.

---

3. Since the statute clearly requires in Sections 10–4 and 10–5 that the nominating sheets be numbered consecutively and signify the office sought, the Board was within its power to enforce those requirements. Plaintiffs have not challenged the constitutionality of these technical statutory and administrative requirements, and we express no opinion on that matter.

Plaintiffs also challenge the sufficiency of the hearing held by the Board. They object that the Board improperly relied upon "*ex parte*" evidence by referring to precinct binders or the master voter registration lists without permitting interested parties the opportunity to examine those documents. Similarly, they claim that the Board refused to permit candidates to copy or inspect candidates' petitions, including their own, upon which factual determinations were based. Finally, they assert that the Board, *sua sponte* and without prior notice, sustained objections to signatures on bases other than those asserted in objectors' petitions.

▪▪▪ The district court concluded that the refused access to precinct binders was "unfortunate" and "unjustified," but it refused to hold this violative of constitutional standards of due process. Similarly, the court found no difficulty in upholding the constitutionality of the "impounding" of other relevant documents, including candidates' petitions. We agree that the Constitution does not compel the actual presence of candidates and objectors at the time petitions were matched by "checkers" against precinct binders or other petitions. However, denial of all access to petitions and binders, although they were the substance of the evidence relied upon for disposition of the various claims, was unfair and unconstitutional.

▪▪ Reliance upon evidence considered *in camera* as the basis for decision is fundamentally inimical to due process. See Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 300, 57 S.Ct. 724, 81 L.Ed. 1093 et seq.; cf. United States v. Atkins, 323 F.2d 733, 743 (5th Cir. 1963); Delta Airlines, Inc. v. CAB (D.C.Cir. 1970), 39 LW 2317. Only the most exceptional circumstances can justify determinations based upon documents which interested parties may not examine. Cf. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. Here the documents have been made the heart of the matter by the practices of the defendant officials themselves, and they are dispositive of the controversies affecting fundamental constitutional rights. By preventing not only copying of these records and documents but their very inspection, the Board severely curtailed the candidates' and objectors' ability to ascertain the exact claims at issue and their opportunity to respond to those claims. The invidious consequences of this *in camera* procedure were exacerbated by the Board's practice of striking irregular signatures upon grounds other than those stated in the objectors' petitions. The sum of these practices meant that petitions' signatures were disqualified for obscure or unknown reasons on the basis of evidence unavailable to the parties and without the opportunity of effective response by those adversely affected by the checkers' investigations. In light of the limited review available in state courts at the time of this election (see People ex rel. Schlaman v. Electoral Board of Cook County, 4 Ill.2d 504, 509, 122 N.E.2d 532 (1955); Telcser v. Holzman, 31 Ill.2d 332, 201 N.E.2d 370 (1964)), such *in camera* practice prevented any meaningful adjudication and violated the Due Process Clause of the Fourteenth Amendment.

*Defendants' Immunity from Damages*

Having found constitutional violations in the conduct of the Board, we must consider the claimed right to damages sought by plaintiffs in Count II of their Amended and Supplemental Complaint. The district court concluded that defendants were immune from damage liability arising from their official acts.

▪▪ It is unnecessary to determine whether defendants' office vests them with the broad immunity from damages conferred upon judicial officers. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Daly v. Stratton, 326 F.2d 340, 342 (7th Cir. 1964); but see McLaughlin v. Tilendis, 398 F.2d 287, 290–291 (7th Cir. 1968); cf. Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987. Even without broad ju-

dicial immunity, damages are inappropriate where defendant officials have acted out of good faith and upon reasonable grounds. Cf. Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288; McLaughlin v. Tilendis, *supra*, 398 F.2d p. 290. Such a defense of qualified immunity, we believe, is available to defendants in this case.

Although found unconstitutional by this Court, the practices of the Board were nevertheless within the ambit of permissible discretion as it appeared at that time. The defendants acted, as the district court indicated, "in apparent good faith." Bacon v. Holzman, 264 F.Supp. 120, 133 (N.D.Ill.1967). Under these circumstances, personal liability for damages should not attach, regardless of whether such state action technically contravened the Fourteenth Amendment.

*Conclusion*

Our holding in this case contains no implications concerning the constitutionality of the state statutory provisions governing nominating petitions. Nor do we express any opinion on the statutory or constitutional validity of the Board's interpretations of the more general statutory standards. Instead, we hold that protection of the full measure of First and Fourteenth Amendment freedoms commands that state regulation of nominating procedures include a clear statement of the specific requirements by which nominating petitions will be tested. We also hold that hearings held by the administrative agency charged with enforcement of these provisions must follow fair procedures affording effective opportunities of participation to those affected by its decisions.

With reference to the instant case, we hold first that the Board of Election Commissioners of the City of Chicago may not enforce strict and technical standards, which have not been definitively stated in the statutory language, without prior publication of precise regulations. This applies to the Board's interpretation of the prohibition against duplicate signatures, the necessity of including street directions as part of voter residence, the requirement that petitions be signed "by the qualified voters in their own proper persons only," and all similar statutory desiderata. Additionally, we hold that the Board must inform and permit a response by a candidate when any signature on his petition has been invalidated by a checker or the Board itself for reasons other than the stated objection of another candidate. Moreover, the Board must grant access for inspection of precinct binders and any other documents or records relied upon by the agency in reaching its decision. Finally, opportunity for argument or evidence, to be of any value, must be afforded after such inspection and before the final Board disposition of objections sustained by the checkers.

Accordingly, plaintiffs' request for declaratory and injunctive relief should be granted insofar as required by this decision. Plaintiffs' request for damages is denied, and the case is remanded to the district court for further proceedings in accordance with this opinion.

Reversed and remanded.

KNOCH, Senior Circuit Judge (dissenting in part).

I would affirm the decision of the District Judge. I agree with his reasoning as set out in his opinion Bacon v. Holzman, N.D.Ill.E.D., 1967, 264 F.Supp. 120, 129, 130, that the flaws in procedure on which the majority bases its reversal do not rise to constitutional stature.