Dominic S. Rinaldi, J.
The petitioner Emanuel Celler was defeated by Elizabeth Holtzman in the primary election held on June 20, 1972 for the Democratic Party nomination for congressman for the 16th Congressional District of Bungs County. A total of 34,978 votes were cast for the three candidates for that office. Holtzman received 15,596 votes, Celler 14,987 votes and a third candidate, O’Donnell, 4,395 votes. The conceded margin of victory for the respondent Holtzman over Celler is 609 votes.
This is a special proceeding instituted by Celler pursuant to subdivision 2 of section 330 of the Election Law to nullify the results of the primary election and to obtain an order directing *19 a new primary election. It is claimed that this should be granted because the primary election was characterized by such frauds or irregularities as to render impossible a determination as to who rightfully was nominated for Congress by the Democratic Party in the 16th Congressional District of Kings. It is conceded that the successful candidate neither encouraged nor participated in the alleged frauds and irregularities. We are therefore concerned to a great extent with irregularities, which if they did occur, are no different than the ones which are usually found in most elections. There is a further claim by petitioner in support of his application that certain procedures which were adopted and followed by the Board of Elections of the City of Uew York were illegal and in violation of statutory requirements and his constitutional rights.
Petitioner has the burden of establishing that the “ irregularities are sufficiently large in number to establish the probability that the result would be changed by a shift in, or invalidation of, the questioned votes.” (Matter of De Martini v. Power, 27 N Y 2d 149,151). Such invalidation will not be directed on the ‘1 mere mathematical possibility that the results could have been changed. ’ ’ (Matter of Badillo v. Santangelo, 15 A D 2d 341, 342). The voter irregularities claimed by petitioner are as follows:
1. A difference between the public counter votes and the number of voters who signed the registration poll records (buff cards) at the primary election. Petitioner claims an approximate difference of about 1,200. The respondent concedes at the most a difference of about 800. The difference probably lies between both figures. It would be a monumental task to arrive at the exact amount. In any event, no proof was offered by petitioner so that the court could make a determination as to the significance of this difference. It may well be assumed that it may be attributed to human error, voter confusion, mechanical problems and factors other than illegal voting. At the most the difference is an irregularity which must be considered together with others of similar import within the concepts of the law as enunciated by the Court of Appeals in the De Martini and Stevenson cases {supra) and other related cases.
2. Unqualified to vote in the Democratic Primary by reason of nonenrollment. These fall into separate categories as follows:
(a) Enrolled in the Liberal Party — petitioner claims 171 and respondent concedes 168.
(b) Enrolled in the Conservative Party — petitioner claims 24 and respondent concedes the same.
*20 (c) Not enrolled in any party — petitioner claims 219 and respondent concedes 218.
(d) No data, or buff cards missing — petitioner claims 59 and respondent concedes 42.
(e) Voters who should not have been permitted to vote because they had not voted in the last two general elections — petitioner claims 244 and respondent concedes 234.
3. No voting number or date on buff card — petitioner claims 525; respondent did not verify this amount.
4. Voters residing in the 51st Election District of the 44th Assembly District whose buff cards were mistakenly inserted in the binder of the 50th Election District of the same Assembly District. The 51st Election District is not in the Celler-Holtzman Congressional District. There is agreement that the buff cards of 99 of such voters were involved.
It should be stressed that agreement as to the total number of irregularities in each of the categories claimed by petitioner is limited solely to such totals. There is no concession by respondent that the claimed irregularities were in fact and law actually irregularities; that the persons whose votes are claimed to be void and irregular, voted for any of the Congressional candidates; and the legal effect of such irregularities, if any.
The court does not regard votes as irregular and void because of failure by an election inspector to note the voting dates or the public counter numbers on the buff cards of those voters who signed in to vote. (See Matter of Stevenson v. Powell, 27 N Y 2d 152 and Matter of Vallone v. Power, 27 N Y 2d 768.) It reaches the same conclusion concerning the claimed public counter excess of either 1153 or 791, as the case may be, over the totals of the signed buff cards. Petitioner contends that such excessYepresents, at the least, persons who were not qualified to vote and that in any event, the votes of such persons, since they did not sign their registration cards as provided by the New York State Constitution and the Election Law, were constitutionally void. No proof of any kind was offered by petitioner other than the fact that the excess did exist. The court cannot assume that the difference represents persons who voted without signing in prior thereto. There may be many other reasons for the resulting difference. At the most, it is an irregularity in the conduct of this election. On the basis of the sampling of the buff cards at the Board of Elections under the supervision of the court, it would be fair to find that the irregularities concerning the public counter excess total 900. To this must be added the irregularities involving persons who voted in the primary election even *21 though they were not qualified to do so because they were enrolled as Liberals or Conservatives or whose enrollments were either blank, void or missing. The total amount of such voters in the primary was 453.
As to the Democrats voting in the wrong Congressional District, there was proof offered that this condition existed for about three hours before it was discovered. As a result, a certain number of enrolled Democrats voted in the 16th Congressional District even though they resided in the 51st Election District of the 44th Assembly District which is the 13th Congressional District. When this situation was brought to the attention of the Board of Elections at about 6:00 p.m. on June 20, 1972, the enrolled Democrats of the 51st Election District whose buff cards were in the 50th Election District and who came to vote after 6:00 p.m. were permitted to sign their buff cards in the 50th Election District and then directed to vote in the 51st Election District. It would be fair to assume from the testimony that of the 99 voters so affected, approximately 50 voted prior to 6:00 p.m. On that basis the court finds that 50 Democrats voted improperly in the wrong district.
There are claims of other void votes because of the following irregularities:
1. Lapsed registrations — there were 234 votes concededly cast by persons who had not voted in a general election during the past two years. The petitioners claim that such votes were void because the registrations of such persons had automatically lapsed by reason of their failure to vote during the two preceding general elections. The court disagrees with this conclusion and holds that the provisions of the Election Law with reference thereto are not self executing. An examination of section 405 of the Election Law as first enacted and then amended in 1960, together with the report of the Joint Legislative Committee which proposed adoption of such amendment and the Governor’s message approving the same, clearly indicates that cancellation under this statute is not automatic. The Board of Elections is required to follow a certain procedure and to take certain steps as specified in subdivisions 2 to 7 inclusive of section 405 in order to cancel the registration of a voter under this section. Since there is no proof that it did so in any of the 234 instances involved, the registration of such voters was valid and they were entitled to vote in the Democratic primary on June 20, 1972.
Commencing with June, 1971, the Board of Elections arranged for registration of voters by properly deputized volunteers at *22 various street locations in the City of New York which were designated as branch offices of the Board of Elections. The volunteer registrars were instructed as to the proper procedures in the performance of their duties and were informed, among other things, that registration cards be signed by two of them, one from each major party, as provided by section 365 of the Election Law. That section provides that the registration card must be signed by two inspectors, each of whom is to be of opposite political affiliation. Testimony elicited from the Board of Elections indicates that many of the buff cards of such registrants containing the signature of only one registrar were, returned to the board and were inserted into the binders of the various election districts. The petitioner claims that many of the “ one registrar signature cards ” were in the binders of the local election boards of the 16th Congressional District on Jpne 20, 1972 and that 1,334 of such buff cards were signed by voters who were then permitted to vote in the Democratic Primary. The petitioner therefore urges that such votes were not,only void by reason of this irregularity but also violated constitutional and statutory requirements. The court is aware of the statutory provisions concerning “ two signature registrations ”. However, it agrees with Mr. Justice Ventiera (Greco v. Larkin, Aug. 21, 1972, Sup. Ct., Kings County) that a voter should not be disenfranchised because of the failure of an employee or member of the Board of Elections to perform an act which is essentially ministerial in nature. The intent of this statute is to prevent fraud in the processes surrounding registration. It was not intended to be used to take advantage of a citizen who in good faith registered to vote at a place designated by the board and on forms supplied by it. He is not to be penalized if, unknown to him, the registrars, designated by the board to facilitate and encourage his registration, failed to sign his card as required by the statute. In such instances it would then be incumbent upon the Board of Elections to notify the registrant and to afford him an opportunity to rectify his so-called ‘ ‘ improper registration ’ ’. Otherwise, in the belief that he was properly registered, he would make no further effort to do so, and would thus find himself disenfranchised without fault on his part. The court can well understand the cancellation of registration or refusal to permit registration of a voter for various reasons or for failure to qualify under the various provisions of the Election Law. However, to nullify the registration of an otherwise qualified voter because of the failure of an employee of the Board of Elections to process his registration in the *23 required manner, would be manifestly unfair and not in keeping with, the intent of the law. The claim of petitioner that such registrations were null and void is therefore rejected by the court for the reasons stated.
There is one last claim by petitioner which is based solely on constitutional grounds. The Legislature adopted chapter 146 of the Laws of 1972 (Election Law, § 242-a, subd. 7) which provided that in primary elections in the City of New York, the names of candidates were to rotate in alphabetical order from election district to election district instead of remaining in the same position in each of the election districts after drawing for position by lot. The purpose of rotation was to afford each candidate an opportunity to appear on the top line (considered a psychologically favored position) an equal number of times. Petitioner claims that this statute is unconstitutional in that there is no rational basis for it and rotation is directed without regard to differences of population in each election district. It is therefore claimed to be lacking in substantive due process in contravention of the State and Federal Constitutions. It is also claimed to be unconstitutional because it was allegedly enacted in violation of the Home Buie requirements of the State Constitution. Petitioner further claims that even if found to be constitutional, the Board of Elections failed to comply with its statutory requirements for this primary and unlawfully delegated its responsibilities to set up the required rotation, to its printer. The court sees no violation of the constitutional rights of petitioner either in the statute or in its application. If indeed, petitioner believed the rotation law to be unconstitutional or improperly enacted in violation of Home Buie requirements, he had ample opportunity to object to the application of its rotation requirements before the primary election on June 20, 1972. He not only did not object to its constitutionality, but he also took advantage of the fact that the rotation schedule set up by the printer at the direction of the Board of Elections gave him the top position on the ballot 87 times as compared with 82 times for his successful opponent. This contention by petitioner is not well taken.
It is the opinion of the court on the basis of all of the foregoing, that petitioner has failed to establish that the irregularities proven by him in this proceeding were of such a nature so as to establish the probability that the result of this primary election would be changed by a shift in or an invalidation of the votes claimed as irregularities.
*24 The constitutional grounds advanced by petitioner in support of his application are also found to be without merit. The petition is therefore dismissed.
Settle order.