Gregory W. ·FAULKNER and Carmen I. Rodriguez, Plaintiffs,

v.

Anthony SADOWSKI, Frank X. Gargiulo, James F. Bass, Robert S. Black, Herbert J. Feuer, Matteo Lumetta, Joseph J. Previte, Martin Richards, Alice Sachs, and Salvatore Sclafani, Commissioners of the Board of Elections in the City of New York, as Members of, and constituting, the said Board of Elections, Defendants,

and

Peter Fontanes and Lana Conor, Intervenor-Defendants.

No. 79 Civ. 4657.

United States District Court, S. D. New York.

March 18, 1980.

Martin E. Connor, Brooklyn, N. Y., for plaintiffs.

Allen G. Schwartz, Corp. Counsel, New York City, for defendants; Patrick F. X. Mulhearn, New York City, of counsel.

John C. Klotz, New York City, for intervenor-defendants.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs brought this action against the Commissioners of the New York City Board of Elections ("the Board") alleging that in violation of 42 U.S.C. § 1983 the Board deprived them of their due process right to appear on the September 11, 1979, primary election ballot as candidates for Assembly District Leaders in part D of the 71st Assembly District. Peter Fontanes and Lana Conor, who would have opposed plaintiffs in the September 11th primary, intervene as defendants. Intervenors contend that plaintiffs' complaint fails to state a claim upon which relief can be granted and move to dismiss pursuant to Rule 12(b)(6), Fed.R. Civ.P., or in the alternative for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Defendants join in intervenors' motion. Plaintiffs cross-move for summary judgment, seeking injunctive relief in the form of a new primary election.

On September 6, 1979, after granting intervenors' motion to intervene, the Court denied plaintiffs' application for a temporary restraining order. The order, if granted, would have placed plaintiffs' names on the September 11th primary ballot. At a subsequent appearance on September 21, 1979, the parties advised the Court that they would stipulate to an agreed statement of facts and file cross-motions for summary judgment. However, no agreed statement of facts has been filed, and the

record discloses that material facts remain in issue. Accordingly, both motions for summary judgment are denied.[1]

Section 6–136(2) of the New York Election Law requires that a petition designating a candidate for party nomination at a primary election

> . . . be signed by not less than five per centum, as determined by the preceding enrollment, of the then enrolled voters of the party residing within the political unit in which the office or position is to be voted for, provided, however, that for the following public offices the number of signatures need not exceed the following limits: . . .
>
> (i) For any office to be filled by all voters of any assembly district, five hundred signatures.

Plaintiffs filed designating petitions containing 672 signatures. The Board conducted a hearing at which it considered the objections to plaintiffs' petitions filed by intervenor Conor. After finding 387 of the signatures valid, the Board determined that plaintiffs had obtained valid signatures of the required five percent of the enrolled Democrats and validated the petitions.

However, in a further attempt to invalidate plaintiffs' designations, intervenor Conor brought an action in the New York State Supreme Court, New York County. A special referee appointed by the state court, after conducting an evidentiary hearing, found that 318 of the 672 signatures were valid. During the course of this hearing a question apparently arose as to the precise number of valid signatures plaintiffs needed to attain the five percent minimum required by Election Law § 6–136. According to the parties here, a Board representative in attendance at that proceeding testified that 314 signatures were necessary. The parties apparently agreed to this figure. Finding, then, that plaintiffs had secured 318 valid signatures and that 314 signatures were required, the special referee reported to the court that plaintiffs'

designating petitions were valid. The referee's report was confirmed.

Intervenor Conor appealed this decision to the Appellate Division of the New York Supreme Court. The Appellate Division, reviewing the matter de novo, reconsidered the validity of the signatures on plaintiffs' petitions and found only 309 signatures were valid. Apparently relying on the requirement of 314 signatures applied below, the Appellate Division reversed and declared plaintiffs' designations invalid.

After their loss in the Appellate Division, plaintiffs inspected the registration records for part D of the 71st Assembly District. Plaintiffs allege that their inspection revealed only 5560 enrolled Democrats and consequently that only 278 valid signatures were required for designation. Application was made to the state trial court to modify the finding that 314 signatures were required so this would conform to the 278-signature requirement plaintiffs allege was applicable. The trial court refused to modify its findings, apparently on the grounds that plaintiffs' appeal to the Appellate Division had divested it of jurisdiction. Plaintiffs' subsequent appeal to the New York Court of Appeals was rejected on the ground that the Court of Appeals had no jurisdiction to consider questions of fact. This action followed.

Plaintiffs' contention that they were deprived of their due process right to run for election is based on the claim that the Board misled them when it represented that 314 valid signatures were required for designation. They maintain that, in giving their consent to the 314-signature figure testified to at the hearing before the special referee, they assumed that the Board had complied with its statutory mandate and updated the voter registration lists before considering their petitions. Plaintiffs direct the Court's attention to section 5–406 of the New York Election Law, which in subsections (1) and (2) provides:

<hr/>

1. Having considered matters outside the pleadings, the Court treats intervenors' Rule 12 motion as a motion for summary judgment.

1. Beginning the second week in December in each calendar year and ending not later than the third week in the succeeding January, the board of elections shall determine which of the registrants under its jurisdiction had been registered under permanent personal registration throughout the two preceding calendar years and while so registered did not during such two years either vote in at least one general, special or primary election or have his registration reinstated under the procedure hereinafter prescribed in this section.

2. If any such registrant has not voted in at least one general, special or primary election since a previous reinstatement under the procedure of this section, the board shall cancel his registration and shall notify him of such cancellation. The board shall forthwith notify each other such registrant by mail that he has not voted in at least one general, special or primary election within such two year period and that unless he fills out, signs and returns an affidavit request form within three weeks of the date of the postmark on the notification his registration will be cancelled.

Final cancellation is not effected until the registrant is sent a second notice indicating that he or she has been stricken from the registration list. *Celler v. Larkin*, 71 Misc.2d 17, 335 N.Y.S.2d 791 (Sup.Ct., Kings Co.) *aff'd*, 31 N.Y.2d 658, 336 N.Y.S.2d 251, 288 N.E.2d 135 (1972).

Section 5–604(1) of the Election Law requires the Board to publish a list of registered voters for each election district before April 1st of each year.[2] Plaintiffs contend that section 5–406 contemplates that the annual updating of registration lists will be completed by the end of February. They argue that the April 1st list must therefore, by law, reflect all cancellations resulting from the section 5–406 updating process.

At the September 6, 1979, hearing on plaintiffs' application for a temporary restraining order the Court heard the testimony of the Board's Executive Director, Elizabeth Dolan. By plaintiffs' accounting, Ms. Dolan testified that the Board began the process of updating its voter registration rolls sometime in July 1979—well after the deadlines allegedly set by section 5–406—and completed the process before plaintiffs' designating petitions were reviewed by the New York state courts. Plaintiffs contend that as a result they were denied the "benefit" of the smaller number of registered Democrats who appeared on the rolls after the voter lists were updated. They argue that if the lists had been updated in accordance with the timetable in section 5–406 fewer than 314 valid signatures would have been required for the validation of their designating petitions.

It also appears to be plaintiffs' argument that an unspecified number of voters who signed plaintiffs' petition were listed on the registration rolls at the time they endorsed the petition but were later removed as a result of a section 5–406 cancellation. Plaintiffs claim that the Board misled them when it published the April 1st voter-registration list, as required by section 5–604(1), without disclosing that the registration of some of the voters on that list might be cancelled before plaintiffs' petitions were reviewed by the Board and, in this instance, by the state judiciary.

---

**2.** N.Y. Election Law § 5–604(1) provides:

The board of elections shall also cause to be published for each election district a complete list of the registered voters of each election district. Such list shall, in addition to the information required for registration lists, include the party enrollment of each voter. At least as many copies of such list shall be prepared as the required minimum number of registration lists.

Lists for all the election districts in a ward or assembly district may be bound together in one volume. Such lists shall be published before the first day of April except that in a year in which any primary is held before the first day of July, such lists shall be published before the first day of March. The board shall keep at least five copies for public inspection at each main office or branch office of the board. Surplus copies of the lists shall be sold at a charge not exceeding the cost of publication.

If plaintiffs' description of the sequence of events is accurate and the law is as they allege, their candidacies were prejudiced in two ways. First, based on the Board's April 1st list, plaintiffs could have computed the number of valid signatures required for designation by taking five percent of the number of registered Democrats. If, as plaintiffs maintain, the list was subject to modification between April 1st and the time the designating petitions were to be filed, however, then it would have been impossible for them to know how many valid signatures they needed.[3] Second, also using the April 1st list, plaintiffs could have checked the signatures on their petitions against the names on the list to make an assessment of the number of valid signatures they had secured. However, if the registration of voters appearing on the April 1st list could be cancelled before plaintiffs' petitions were considered by the Board, then plaintiffs would not have been able to determine how many of the signatures were valid.

Plaintiffs argue that this prejudice deprived them of their due process right to appear on the primary ballot. On the record before it, however, the Court is not prepared at this juncture to determine as the law of the case that, even if the facts are as plaintiffs allege, plaintiffs have been deprived of any rights guaranteed by the United States Constitution.[4]

The right to vote, of course, is protected by the first amendment as applied to the states through the due process clause of the fourteenth amendment. This right is unconstitutionally impaired if ballot access is unreasonably burdened. *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Moreover, as the court recognized in *Briscoe v. Kusper*, 435 F.2d 1046, 1053 (7th Cir. 1970), denial of ballot access also can effect a deprivation of the first amendment rights of free association and petition for redress of grievances. Plaintiffs do not contend that any particular state election statute is unconstitutional. *Cf. Fishman v. Schaffer*, 418 F.Supp. 613 (three-judge court), *aff'd mem.*, 553 F.2d 93 (2d Cir.), *application for injunction denied*, 429 U.S. 1325, 97 S.Ct. 14, 50 L.Ed.2d 56 (1976) (Marshall, J., in chambers). Rather, they argue that the Board's failure to follow the state's presumably constitutional election law provisions prevented their obtaining access to the primary ballot. To have violated 42 U.S.C. § 1983, however, it is not necessary that the Board have followed any particular statute. It is enough that the Board's allegedly unconstitutional actions were taken under color of law in its capacity as a public agency. *United States v. Wiseman*, 445 F.2d 792, 796 (2d Cir.), *cert. denied*, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 287 (1971). Accordingly, plaintiffs have stated a sufficiently plausible claim under section 1983 to enable their action to proceed to trial. *See Briscoe v. Kusper, supra*, 435 F.2d at 1052–1057, and *Williams v. Sclafani*, 444 F.Supp. 906, 911 (S.D.N.Y.), *aff'd mem. sub nom. Williams v. Velez*, 580 F.2d 1046 (2d Cir. 1978).

In addition to their contention that plaintiffs' allegations do not state a claim of

---

**3.** Section 6–136(2) requires five percent of the "then enrolled" Democrats, "as determined by the preceding enrollment." It is unclear whether this refers to the number of voters shown on the April 1st list or to the number at the time the petition is filed with the Board (in this case in July). If the latter is the case, then plaintiffs could only have known the minimum number of valid signatures needed and would have been required to obtain additional signatures to account for voters registering after the cutoff date for the April 1 list and before the petitions were filed. The number of registered Democrats appearing on the enrollment list could not, of course, decrease between April and July if the annual § 5–406 cancellation process had been completed by the end of February.

**4.** Summary judgment should not be granted on a record that is not adequately developed. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 497, 27 L.Ed.2d 613 (1971) (per curiam). Although the denial of summary judgment ordinarily establishes the law of the case on the issue decided, it is not necessary in every case that it do so. Thus, the Court may in this instance deny the parties' cross-motions and leave for another day a determination of the issues of law raised by the motions. *See Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 134–136 (2d Cir.), *cert. dismissed*, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956).

 

denial of due process, intervenors argue that plaintiffs should be precluded from relitigating the question of how many valid signatures were required for designation. They contend that in the state action plaintiffs freely stipulated that 314 valid signatures were required for designation and thereby gave up the opportunity to litigate this question. It is not disputed that plaintiffs agreed to the 314-signature figure, but it is unclear under exactly what circumstances their assent was given. Plaintiffs claim that they accepted the Board's representation on the assumption that the section 5–406 cancellation process had been completed. Intervenors argue that only if the Board had by "trickery" allowed plaintiffs to believe it had complied with section 5–406 would this assumption make a difference. Precisely what representations the Board made during the parties' state court proceedings remains a material fact in issue.

The Board, defendant here, appears to have been at least a nominal party in the prior state court action. The Board's position in the parties' earlier state litigation may bear on the applicability of the doctrine of *res judicata* under 28 U.S.C. § 1738. However, even if *res judicata* does not apply in the context of this action brought under 42 U.S.C. § 1983, *see Winters v. Lavine*, 574 F.2d 46, 56–60 (2d Cir. 1978), any due process claim plaintiffs might assert here could be cut short under the doctrine of collateral estoppel. Application of collateral estoppel would bar the relitigation of any issue actually litigated in, and necessary to the determination of, the state action. The Court has not been provided with the transcript of any state court proceedings and cannot determine from the record what issues actually were litigated in the prior action.

Inasmuch as material facts remain in issue,[5] the parties' cross-motions for summary judgment are denied. Both motions are denied without prejudice and may be renewed at a later time should the record then enable this matter to be decided summarily. The parties are directed to complete discovery by May 16, 1980, and submit a pre-trial order by June 16, 1980.

It is so ordered.

---

5. Even if plaintiffs persuade the Court that they should not be bound by the 314-signature requirement applied in their state court litigation, the factual question of what the requirement should have been remains to be answered. Surely plaintiffs do not expect the Court to accept their unsupported assertion that 278 is the proper figure. The Court must determine, first, at what point in time the voters on registration lists are to be counted, *see* note 3 *supra*, and, second, how many voters would have been on the list if the § 5–406 cancellation process had been completed on schedule. Moreover, plaintiffs also must establish causation—that is, that the alleged failure of the Board to comply with § 5–406 is what kept plaintiffs off the ballot.